2018 PA Super 86

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| PATRICK TIGHE | |
| Appellant | No. 266 MDA 2017 |

Appeal from the Judgment of Sentence January 13, 2016
In the Court of Common Pleas of Lackawanna County
Criminal Division at No(s): CP-35-CR-0001297-2012

BEFORE:  BOWES, OLSON, AND RANSOM, JJ.

OPINION BY BOWES, J.:                    **FILED APRIL 12, 2018**

Patrick Tighe appeals from the judgment of sentence of twenty to forty years incarceration, imposed following his convictions for, *inter alia*, rape, involuntary deviate sexual intercourse ("IDSI"), and sexual assault.  We affirm the convictions, but vacate the judgment of sentence.

The trial court thoroughly set forth the facts underlying Appellant's convictions in its Pa.R.A.P. 1925(a) opinion, which we adopt herein:

> On May 29, 2012, J.E. was 15 years of age.  J.E. did not have a permanent residence. She lived at both her father's home and her grandmother's home in Scranton, Pennsylvania.  On the night in question, J.E, resided at her father's residence with her older sister, [M.L.], and [M.L.]'s boyfriend, [C.E.].  J.E.'s mother and father were both incarcerated for drug usage. J.E. called the Defendant to drive her to a Wal-Mart to purchase tampons.  The Defendant was 58 years of age.  The Defendant agreed, and he drove his white minivan to meet J.E.  J.E. entered the minivan and they proceeded to Wal-Mart.  J.E purchased tampons at

Wal-Mart and left the store with the Defendant a few minutes later. After the purchase, J.E. asked the Defendant to take her to a McDonald's restaurant. The Defendant agreed. Before reaching McDonalds, the Defendant expressed his desire to stop at his friend's house. The owner of the home was Joseph Hasham. The Defendant and J.E. entered the unoccupied home. J.E. used the restroom and searched the refrigerator—located in the kitchen—for a beverage. The Defendant entered the kitchen and pulled J.E. by the back of her shorts without warning. J.E. asked the Defendant what he was doing, but he did not reply. The Defendant took her into the living room, placed her on a couch, and flipped her on her back. J.E. repeatedly asked the Defendant to stop, but he covered her mouth. Despite J.E.'s protests, the Defendant removed her shorts; ripped out her tampon; and inserted his penis into her mouth and vagina. The incident lasted about 5 minutes.

After the Defendant raped J.E., she pleaded for the Defendant to drive her home. He eventually agreed, on the condition that she would not tell anybody about the incident. He also asked her to call him the next day. The Defendant drove J.E. to McDonalds. He borrowed Joseph Hasham's car because of a broken taillight in his own vehicle. Afterwards, he dropped her off at J.E.'s father's residence. J.E. rushed inside. She found [M.L.] and [C.E.] sleeping on the couch. The next morning—on May 30, 2012—J.E exhibited signs of distress and nervousness. J.E. told [M.L.] that the Defendant raped her, but J.E. asked [M.L.] not to discuss the incident with anyone else. Instead, [M.L.] called the police. Detective Vincent Uher from the Scranton Police Department responded and transported J.E. to the Children's Advocacy Center. The Children's Advocacy Center conducted a medical examination and collected a rape kit under the supervision of various experts. Joann Armaghan, a Forensic Scientist Supervisor for the Pennsylvania State Police, corroborated J.E.'s testimony and concluded that the test for the presence of saliva on J.E.'s neck and right breast was positive. Sara Harrier, a forensic DNA scientist for the Commonwealth of Pennsylvania, also corroborated J.E.'s testimony. Hamer testified that DNA on J.E.'s pubic hair contained a mixture of DNA from two individuals. Under statistical calculation, Hamer concluded that the most likely combination contained DNA of both J.E. and the Defendant.

> Detective Uher learned that the Defendant tried to contact J.E. on her telephone, so he conducted a consensual phone intercept—also known as a wiretap—to gather additional information and/or evidence of the case. J.E. consented to the phone call. During the phone call, the Defendant made several incriminating statements, which eventually led to his arrest.

Trial Court Opinion, 7/28/16, at 7-10 (citations to transcript omitted).

Appellant represented himself at trial, and was convicted and sentenced on October 25, 2013 to an aggregate sentence of twenty to forty years incarceration. That sentence included the imposition of mandatory minimum sentences of ten to twenty years incarceration at the counts of rape and IDSI. The trial court imposed a concurrent sentence of one to two years at indecent assault, and an additional concurrent sentence of eight to sixteen years incarceration at unlawful contact with a minor.

Appellant filed post-sentence motions. The transcription of the notes of testimony was significantly delayed, leading to a September 18, 2015 motion requesting reinstatement of his post-sentence motion rights *nunc pro tunc*. The Commonwealth consented to this request, leading to a second set of post-sentence motions. While those motions remained active, the Commonwealth requested that the trial court vacate and resentence Appellant due to subsequent caselaw pertaining to mandatory minimum sentences.

On January 13, 2016, the trial court resentenced Appellant to the same aggregate sentence of twenty to forty years incarceration. However,

as relevant to one of his issues on appeal, the trial court imposed a consecutive sentence for indecent assault whereas the original scheme called for a concurrent sentence at that charge.

Appellant filed a timely notice of appeal, and complied with the trial court's order to file a concise statement.[1]  The trial court authored its opinion, and the matter is ready for review.  Appellant raises eleven issues, which we have reordered for ease of discussion.[2]

> 1.  Whether the trial court violated the Appellant's 6th Amendment rights under the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution by refusing to allow Appellant, acting *pro se* at trial, to cross-examine and/or

---

[1] The appeal was originally docketed at 884 MDA 2016, which this Court dismissed on December 15, 2016, due to counsel's failure to file a brief.  The trial court subsequently reinstated Appellant's appellate rights *nunc pro tunc*.

[2] Appellant's statement of questions presented calls to mind the view of the often quoted Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit regarding this shotgun approach to appellate advocacy:

> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to **any** of them ... [and] it is [this] presumption . . .  that reduces the effectiveness of appellate advocacy.

***Commonwealth v. Robinson***, 864 A.2d 460, 480, n.28 (Pa. 2004) (quoting Aldisert, "The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original)).

question the victim at any time during trial or bail hearing, but instead required standby counsel to ask the victim all questions on Appellant's behalf using written questions prepared by Appellant in advance of cross-examination and/or questioning?

2. Whether the trial court committed an error of law and/or an abuse of discretion and/or otherwise violated the Appellant's right to a fair trial as guaranteed under both the United States Constitution and the Pennsylvania Constitution by refusing to rule on the Appellant's motion to recall thereby prejudicing the Appellant and his ability to properly present his defense?

3. Whether the trial court committed an error of law and/or an abuse of discretion, when it required Appellant to state every question he intended to ask the victim on recall with opposing counsel present thereby denying Appellant's right to a fair trial as guaranteed by both the United States Constitution and the Pennsylvania Constitution?

4. Whether the trial court abused its discretion and denied the Appellant's right to a fair trial as guaranteed by the United State[s] Constitution and the Pennsylvania Constitution when it allowed the victim to remain in the courtroom throughout the trial despite a sequestration order being issued and Appellant's intention to recall her despite the fact that Appellant requested to examine her in his case in chief?

5. Whether the trial court committed an error of law and/or an abuse of discretion, when it failed to grant a mistrial after the victim was allowed to hear her testimony, evidence and the subject matter of questions Appellant intended to ask her upon recall thereby prejudicing Appellant and denying him his right to a fair trial?

6. Whether the Appellant was denied his right to counsel in violation of the 6th Amendment of the United States Constitution and/or Article I, Section 9 of the Pennsylvania Constitution?

7. Whether the trial court abused its discretion in appointing "stand-by counsel" for Appellant with whom the Appellant expressly stated he had irreconcilable differences and/or in failing to examine on the record whether such conflict actually existed as Appellant claimed?

8. Whether the trial court abused its discretion when it denied [Appellant's] request for an expert [to] be appointed to conduct independent testing, DNA testing and/or to assist him in his defense?

9. Whether the trial court committed an error of law and/or an abuse of discretion in limiting Appellant's right to cross-examine the Commonwealth's witness, [M.L.], about her drug use on the date of the incident?

10. Whether the trial court abused its discretion by denying Appellant's request to have his own psychological evaluation prior to the hearing to determine whether he was a sexually violent predator?

11. Whether the trial court issued an illegal sentence by finding that indecent assault did not merge for sentencing purposes or in the alternative abused its discretion when increas[ing] the sentence for indecent assault on resentence than what was originally imposed?

Appellant's brief at 5-7 (reordered).

## I.     Limitation Upon Cross-Examination of J.E.

Appellant's first argument appears to be an issue of first impression in this jurisdiction, and addresses the fact that the trial court granted the Commonwealth's motion to prohibit Appellant from personally cross-examining J.E. The Commonwealth filed the motion after Appellant, while at liberty and awaiting trial, contacted J.E. and asked her, "Why are you doing this to me? I didn't hurt you. Please don't put me in jail for life." N.T., 6/4/13, at 42. Following an evidentiary hearing at which J.E. testified to those facts and that the call scared her, the trial court granted the motion and required Appellant to provide Attorney Christopher Osborne, Appellant's

stand-by counsel, with the questions he wished to ask J.E. at trial. The court directed that Attorney Osborne was to ask J.E. the questions.

Appellant maintains that "Prohibiting Appellant from questioning the victim is a violation of his constitutional rights." Appellant's brief at 23. The constitutional right he asserts is at issue is his right of self-representation. Succinctly stated, Appellant argues that the right to represent himself necessarily includes the right to act as attorney for all purposes, and cannot be limited. Appellant also notes that requiring counsel to ask the questions amounts to hybrid representation, which is impermissible.

In *Faretta v. California*, 422 U.S. 806 (1975), the United States Supreme Court recognized that the Sixth Amendment right to counsel implicitly includes the right to self-representation, which applies to the States through the Fourteenth Amendment's guarantee of due process of law. Pennsylvania has recognized the same right under Article I, Section 9 of the Pennsylvania Constitution. *See Commonwealth v. Szuchon*, 484 A.2d 1365 (Pa. 1984). The denial of the right to proceed *pro se* cannot be harmless, and a violation requires a new trial. *See Commonwealth v. Starr*, 664 A.2d 1326, 1334–35 (Pa. 1995) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)). Whether that right was violated presents a question of law, for which our review is *de novo*. *See Commonwealth v. El*, 933 A.2d 657, 662 (Pa.Super. 2007), *aff'd*, 977 A.2d

1158 (Pa. 2009). For purposes of this claim, the question of whether Appellant validly asserted his right to represent himself is not at issue.

Before addressing Appellant's substantive claim, we note that Appellant explicitly distances himself from the analysis offered by the Commonwealth and the trial court, which focused on the Sixth Amendment right of confrontation. Since other jurisdictions that have considered this issue have drawn parallels to that right, we begin our analysis there.

"In all criminal prosecutions, the accused shall enjoy the right . . . . to be confronted with the witnesses against him[.]" U.S. Const.Amend. VI. The trial court principally relied on **Maryland v. Craig**, 497 U.S. 836 (1990), which reviewed a Maryland statute that permitted a judge to present the testimony of a child abuse victim to the jury *via* one-way closed circuit television. That procedure could be invoked only if the judge determined that testifying in the courtroom would "result in the child suffering serious emotional distress such that the child cannot reasonably communicate." **Id**. at 841 (quoting statute). In such cases, the statute called for the witness to testify in a separate room with only the prosecutor and defense counsel present. The judge, jury, and defendant remained in the courtroom, where a monitor would relay the testimony, with the defendant remaining in communication with defense counsel through electronic means. The child witness and the defendant could not see each other.

The *Craig* Court explained that prior precedents interpreted the Confrontation Clause to guarantee a face-to-face meeting with witnesses at trial, which derived from both the literal reading of the Clause as well as its historical roots. *Id*. at 844. *Craig* nevertheless stated that this right is not absolute, citing *Coy v. Iowa*, 487 U.S. 1012 (1988). In *Coy*, the High Court held that the Confrontation Clause was violated by the use of a protective screen which prevented the child witnesses in an abuse case from seeing the defendants as they testified. However, *Craig* explained that the holding in *Coy* turned on the fact the procedure examined applied a presumption of trauma, and suggested that an exception would be allowed "when necessary to further an important public policy[.]" *Craig*, *supra* at 845 (quoting *Coy*, *supra* at 1021). Resolving the question left open by *Coy*, *Craig* held that the Maryland statute did not violate the defendant's Confrontation Clause rights. *Craig* determined that face-to-face confrontation is not "an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." *Id*. at 849-50. Simultaneously, that requirement could not "easily be dispensed with." *Id*. at 850. The State could justify its limitation "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id*.

Applying those principles to the Maryland statute, *Craig* determined that a "State's interest in the physical and psychological well-being of child

abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id*. at 853. Simultaneously, the Court required "an adequate showing of necessity" to justify the use of the procedure, which "of necessity must of course be a case-specific one[.]" *Id*. at 855. The mere fact that face-to-face confrontation is generically traumatic and unpleasant was not sufficient.[3] As to the second component, that the reliability of the testimony is otherwise assured, the Court determined that the statute protected

> all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony.

*Id*. at 851.

*Craig* is a Confrontation Clause case and does not address the right of self-representation. The trial court extensively relied on *Fields v. Murray*,

---

[3] The Court declined to specify the minimum showing of emotional trauma required, holding only that the Maryland statute's requirement of "serious emotional distress such that the child cannot reasonably communicate" passed constitutional muster.

49 F.3d 1024 (4th Cir. 1995) (*en banc*), in making its ruling. In **Fields**, the United States Court of Appeals for the Fourth Circuit held that a court could properly prevent a *pro se* defendant from cross-examining the child victims where the defendant conceded that the motivation for representing himself was to cross-examine the victims.

> If a defendant's Confrontation Clause right can be limited in the manner provided in **Craig**, we have little doubt that a defendant's self-representation right can be similarly limited. While the Confrontation Clause right is guaranteed explicitly in the Sixth Amendment, U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."), the self-representation right is only implicit in that Amendment, **Faretta v. California**, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). The self-representation right was only firmly established in 1975 in **Faretta**, and then only over the dissent of three justices, *id.* at 836, 95 S.Ct. at 2542 (Burger, C.J., dissenting, joined by Blackmun and Rehnquist, JJ.). Moreover, it is universally recognized that the self-representation right is not absolute. **See, e.g., McKaskle v. Wiggins**, 465 U.S. 168, 176–77, 104 S.Ct. 944, 950, 79 L.Ed.2d 122 (1984); **Bassette v. Thompson**, 915 F.2d 932, 941 (4th Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991).
>
> . . . .
>
> Fields' self-representation right could have been properly restricted by preventing him from cross-examining personally some of the witnesses against him, which is one "element" of the self-representation right, if, first, the purposes of the self-representation right would have been otherwise assured and, second, the denial of such personal cross-examination was necessary to further an important public policy.

*Id*. at 1035.

*Murray* then noted that the purpose of self-representation was "to allow the defendant 'to affirm [his] dignity and autonomy' and to present what he believes is his 'best possible defense.'" *Id*. at 1035 (quoting *McKaskle*, *supra* at 176-78). *Murray* recognized that the defendant's dignity and autonomy were obviously limited by preventing personal cross-examination, thus affecting the jury's perception that he was representing himself. However, the court determined that this restriction only "reduced slightly" his ability to present a chosen defense. That ability was

> otherwise assured because he could have personally presented his defense in every other portion of the trial and could even have controlled the cross-examination by specifying the questions to be asked. As a result, we are convinced that the purposes of the self-representation right were better "otherwise assured" here, despite the denial of personal cross-examination, than was the purpose of the Confrontation Clause right in *Craig* when the defendant was denied face-to-face confrontation with the witnesses.

*Id*. at 1035–36. Addressing the second aspect of *Craig*, the State's interest, the court determined that since *Craig* held that the interest in the physical and psychological well-being of child abuse victims could outweigh the right to face-to-face confrontation, it followed that the right to self-representation could be limited for the same reason.

Since Appellant does not claim a deprivation of his Confrontation Clause rights, we do not address whether the unquestionable right to

confront J.E. meant that Appellant could avail himself of that right when serving as his own counsel.[4]  Instead, the question is whether the principles announced in *Craig*, which permitted a procedure that limited the Confrontation Clause rights due to the countervailing interests of the victim when the procedure otherwise preserved the reliability of the cross-examination, should be adopted in this Commonwealth as a permissible restriction on the right of self-representation.  We conclude that the answer is yes.

Preliminarily, we are not persuaded by Appellant's fundamental assertion that the right of self representation is an absolute right that cannot be curtailed.  Significantly, in *McKaskle*, *supra*, the High Court considered whether *Faretta* permitted the participation of standby counsel even without the express consent of the defendant.  Therein, Wiggins informed the court he would proceed *pro se* and "objected even to the court's insistence that

---

[4] *Craig* has not been overruled by the High Court.  However, later cases, such as *Crawford v. Washington*, 541 U.S. 36 (2004), may cast some doubt on the analysis employed by *Craig* insofar as *Craig* determined that the constitutional right of confrontation could be satisfied on something less than actual face-to-face confrontation so long as the testimony was otherwise reliable.  *Crawford* rejected that proposition as applied to testimonial statements.  "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  *Id*. at 68-69.  However, the issue of face-to-face confrontation was not at issue in *Crawford*, and neither was the related context presented herein.

counsel remain available for consultation." *Id*. at 172. That request was denied and the trial judge appointed two attorneys to act as standby counsel. Throughout the trial, Wiggins occasionally consulted with standby counsel, and the attorneys sometimes initiated private consultations. The Court of Appeals held that Wiggins' Sixth Amendment rights were "violated by the unsolicited participation of overzealous standby counsel[.]" *Id*. at 173 (citation omitted).[5]

The High Court reversed and held that *Faretta*'s "logic . . . indicate[s] that no absolute bar on standby counsel's unsolicited participation is appropriate or was intended." *Id*. at 176. The Court explained:

> In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way. *Faretta* itself dealt with the defendant's affirmative right to participate, not with the limits on standby counsel's additional involvement. The specific rights to make his voice heard that Wiggins was plainly accorded, form the core of a defendant's right of self-representation.

*Id*. at 177 (internal citation omitted).

*McKaskle* is not directly on point as that case did not involve any limitation upon the *pro se* defendant's ability to present his case, but rather

---

[5] Wiggins abandoned his claim that the mere presence of standby counsel over his objection warranted reversal; the Court examined only whether the "*Faretta* right to present his defense *pro se* was impaired by the distracting, intrusive, and unsolicited participation of counsel throughout the trial." *McKaskle v. Wiggins*, 465 U.S. 168, 176 (1984).

limitations on standby counsel's ability to participate absent the express invitation of the defendant. However, *McKaskle* declined to hold that *Faretta* is susceptible to the all-or-nothing approach advanced by Appellant. If the primary focus of the right of self-representation is whether the defendant had a fair chance to present his defense, that goal was undoubtedly met herein despite Appellant's inability to personally ask his questions. Appellant supplied a list of questions to be asked, and there is nothing to indicate that Appellant was prevented from consulting with standby counsel in the event he wished to ask additional questions in response to J.E.'s answers. This is similar to the fact that the defendant in *Craig* was in electronic communication with his counsel. Therefore, his right to cross-examine J.E. was met in a broad sense, and was limited only in the narrow sense that he was not allowed to personally ask the questions.

Appellant cites the following quotations as establishing his preferred rule: *Commonwealth v. Davido*, 868 A.2d 431, 438 n.12 (Pa. 2005) ("In fact, requiring counsel to take further action on a defendant's behalf after the defendant has requested to proceed *pro se* would undermine the Sixth Amendment right to self representation."); *Commonwealth v. Spotz*, 47 A.3d 63, 83 (Pa. 2012) ("[A] defendant's choice to proceed *pro se* must be honored out of that respect for the individual which is the lifeblood of the law even when the defendant acts to his or her own detriment.") (internal quotation marks and citation omitted). Both quotations reference situations

markedly different from the present case. Distilled to its essence, we view the bar against intrusions by standby counsel—which is not an absolute bar in any event—as referring to situations in which the intrusions pose a risk of undermining the *pro se* defendant's chosen defense.[6]  Herein, Attorney Osborne's participation did not impede Appellant's defense in any way; rather, Attorney Osborne acted as a conduit for Appellant's own questions. Therefore, we cannot agree with Appellant's claim that the court "den[ied] Appellant his right to question the victim."  Appellant's brief at 21.  The trial court denied Appellant the right to **personally** question the victim.[7]  The right to confront J.E. was fully honored, albeit through standby counsel serving as Appellant's mouthpiece.  While we do not downplay the significance of this intrusion, we reject Appellant's position that it is categorically impermissible.

Having established that the right to self-representation can be limited in this fashion, we briefly address whether that intrusion was warranted in

---

[6] For instance, that rationale would apply if standby counsel refused to ask a question submitted by Appellant on the basis it was unwise as a matter of strategy.

[7] We recognize Appellant's assertion that the procedure utilized in this case can create analytical difficulties in the event standby counsel interferes, since such claims would amount to ineffective assistance which generally cannot be raised when a defendant represents himself.  We do not reach that issue, as Appellant's complaint is that his rights were violated by the mere act of standby counsel asking the questions.

this particular case. We are persuaded by the analysis set forth in **Fields** that, if the constitutional right of confrontation can be limited on the basis of emotional trauma to the victim, then it follows that the same State interest serves to justify the restriction at issue.[8] Indeed, the fact that **Craig** permitted a limitation of actual face-to-face confrontation suggests that the lesser intrusion herein, where J.E. was subjected to that face-to-face confrontation, is permissible. Additionally, we find that this intrusion did not affect the jury's perception that Appellant was representing himself, any more than the intrusions in **McKaskle** did. With the exception of this one witness, Appellant cross-examined all other witnesses, made opening and closing statements, and otherwise presented his own defense according to his wishes.

_____

[8] Whether the Commonwealth sufficiently established as a matter of degree that J.E. would suffer emotional trauma as contemplated by **Craig** is not before us, as Appellant avers that his right to act as counsel precludes any limitation upon his right to represent himself, regardless of any trauma to the witness. "The Appellant had every right to question the victim in this case and there was no basis for limiting that right." Appellant's brief at 27.

Simultaneously, we find, consistent with **Craig**, that the limitation could be justified as a matter of law only if the Commonwealth established that this minor victim was likely to suffer some emotional trauma by being directly cross-examined by her accuser beyond the natural trauma accompanying that confrontation. To hold otherwise would apply a presumption of trauma, which **Craig** indicates is impermissible. We find that the extra evidence adduced by the Commonwealth respecting Appellant's violation of the no contact order and J.E.'s testimony regarding her fear of Appellant served to remove this case from that unconstitutional presumption.

Finally, Appellant maintains that the trial court necessarily erred because no statutory authority existed to permit its ruling. Relatedly, Appellant concedes that authority such as *Fields* exists, but argues that it is irrelevant since no Pennsylvania decision had cited or adopted that rationale at the time of the trial court's decision. The salient issue is whether Appellant's constitutional right to self-representation was violated, not whether a statute or prior authority permitted the instant restriction. Since we have determined that Appellant's constitutional rights were not violated, the trial court did not err.

## II. Limitations Upon Appellant's Recalling J.E.

We consider Appellant's second, third, fourth, and fifth claims together, as they all broadly relate to various rulings regarding Appellant's request to recall J.E. as a witness in his case-in-chief.[9]

We review the first three claims for an abuse of discretion. "The trial judges of this Commonwealth exercise broad powers while presiding at the trial of cases assigned to them. These powers include ruling on the admission or exclusion of evidence and controlling the scope of examination and cross-examination of witnesses." *Commonwealth v. Pittman*, 466

---

[9] The claims are that the trial court erred in: delaying its ruling on Appellant's motion to recall J.E.; requiring Appellant to state which questions he intended to ask J.E. if she were recalled; allowing J.E. to remain in the courtroom; and failing to grant a mistrial.

A.2d 1370, 1373 (Pa.Super. 1983). "We review a trial court's decision to limit re-direct examination for an abuse of discretion." *Commonwealth v. Berry*, 167 A.3d 100, 109–10 (Pa.Super. 2017). The same principle applies to the court's decision to permit recall of a witness. "[T]he decision whether a party may be recalled is, under Pennsylvania law, left to the trial court's discretion. The decision is not reversed unless it constitutes a 'very gross abuse of discretion.'" *Commonwealth v. Crosby*, 297 A.2d 114, 116–17 (Pa. 1972) (citation omitted). As to sequestration, the abuse of discretion standard applies, and an appellant must show prejudice. *See Commonwealth v. Stevenson*, 894 A.2d 759, 767 (Pa.Super. 2006).

Regarding the mistrial claim, we likewise review the trial court's decision for an abuse of discretion. *See Commonwealth v. Stafford*, 749 A.2d 489, 500 (Pa.Super. 2000) (citations omitted). These additional principles apply:

> "[A] mistrial [upon motion of one of the parties] is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." *Commonwealth v. Lease*, 703 A.2d 506, 508 (Pa.Super.1997). It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. *Id.* On appeal, our standard of review is whether the trial court abused that discretion. *Stafford*, 749 A.2d at 500.
>
> An abuse of discretion is more than an error in judgment. *Commonwealth v. Griffin*, 804 A.2d 1, 7 (Pa.Super. 2002). On appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised by the trial court was manifestly

unreasonable, or the result of partiality, prejudice, bias, or ill-will. ***Id.***

***Commonwealth v. Tejeda***, 834 A.2d 619, 623 (Pa.Super. 2003) (footnote omitted).

Factually, all four claims relate to Appellant's desire to recall J.E. during his case-in-chief, and we examine those facts in detail.[10]  Prior to the Commonwealth presenting its case, the trial court granted Appellant's request for a sequestration order.  N.T., 7/8/13, at 118-19 ("I'm going to grant the motion.  Any witnesses must be sequestered until after they testify. And please instruct the witnesses that they're not to discuss their testimony with any witness who is waiting to testify.").  Following the conclusion of his cross-examination of J.E., Appellant sought to reserve the right to recall her.  During a break in the proceedings, the judge addressed that request and indicated a belief that the sequestration order remained in effect.

> MR. TIGHE: Your Honor, you said you will rule later on about keeping [J.E.] available?
>
> THE COURT: Yeah. We can discuss it. When we get to that point, we'll discuss if you want to call her in your case in chief, we'll discuss it out of the presence of the jury. I don't think she's going anywhere. I think she's available today and tomorrow, right?

_____

[10] The parties frame the issue as one of recalling a witness, as opposed to calling a witness as part of the Appellant's case-in-chief.

ATTY. TALERICO: Actually, Your Honor, I would object to her not being in the courtroom. She has specifically requested the opportunity to be here. I think she has a right to be here. He had the opportunity to cross.

THE COURT: Okay.

ATTY. TALERICO: I'm not comfortable waiting and then from the jury's standpoint seeing her not physically here to care about what's happening.

THE COURT: Okay. So do you understand the point that he's making? The issue of whether you may recall her as a witness in your case in chief has not yet been decided. And we will cross that bridge when we come to it. But there is a sequestration order in effect and what Attorney Talerico is asking is that she be permitted to sit in now because she is the alleged victim in the case. And understood under Pennsylvania Constitution, victims enjoy many rights. I'm going to grant that request.

MR. TIGHE: All right. Your Honor, I would just like to state on the record, too, part of your ruling on me not being able to cross examine the [victim] and how it brought up how she couldn't stand being in the room with me, how it caused her to have flashbacks, and trauma, and now they want her to come in the courtroom, like, this is having your cake and eating it, too. I'm just putting it on the record.

THE COURT: I know. I understand.

MR. TIGHE: Your Honor, we'll probably be revisiting this again in the near future.

THE COURT: Okay. I appreciate that.

MR. TIGHE: I object to her being in the courtroom. I still want to cross examine.

THE COURT: Whether you will be allowed to call her in your case in chief is completely not clear. I haven't ruled on it yet. I have no idea what your rational[e]--I'm willing to listen to your argument. However, since it is not clear to me that she will be allowed to be recalled in your case in chief because she is the

victim in this case and she does have rights under Pennsylvania's Constitution. I'm going to allow her to sit in for testimony until we get to that point, okay, if she chooses to. She may choose not to, I don't know what she's going to do. I have to balance. Remember it's a balancing test. It's balancing her rights against yours.

MR. TIGHE: The prosecution just said, she said she wanted to come in and listen. The prosecution just said it.

THE COURT: Well, that's what they're saying, but I don't know. I don't know what she wants to do. I'm not going to take what they say that she says. Do you understand? Okay. We're in recess for lunch then. Thank you. See you at 1:00.

N.T., 7/9/13, at 85-88. Later that day, Appellant informed the court he still intended to recall J.E., to which the court replied, "Potentially. We have to address that." *Id*. at 278. J.E. was permitted to remain in the courtroom.

The next day, the trial court asked Appellant why he desired to recall J.E. He explained that he wished to cross-examine her based on phone records that were admitted after J.E. testified, and which he stated would impeach her testimony. The Commonwealth opposed the request, on the grounds that the phone records were in evidence and Appellant could argue in closing that the actual records contradicted J.E.'s testimony. During this discussion, the trial court asked Appellant to list the questions he wished to ask.

THE COURT: Tell me the question, now, on the record.

MR. TIGHE: I need a copy of the transcript. I can't remember all of it.

THE COURT: No. You're saying that you want to recall her for the purpose of asking her a few questions. Tell me what the questions are, now, that you want to ask.

MR. TIGHE: The phone call she denied taking that she called me that I called her. I'm trying to say that -- I don't want -- every time -

THE COURT: Okay. Here's what we're going to do, over the lunch--in recess, I'm going to ask the court reporter to prepare a portion of [J.E.]'s testimony that relates to cross examination on this topic. Once we have that record, we will review it. At that time, I will be able to mae [*sic*] a decision as to whether or not she'll be able to be recalled.

N.T., 7/10/13 at 117.  Later, the trial court then stated in open court that it had read J.E.'s direct testimony.

THE COURT: The record should reflect, that during the recess I requested the court reporter to transcribe the portion of the transcript that relates to cross examination and redirect of [J.E.]. I have determined what questions have been asked on cross-examination. I just had the opportunity to read to the parties, in open [c]ourt, the portion of the transcript as it relates to those issues.

Now, sir, are there questions that you want to have asked of [J.E.] that were not asked during that -- during the time when she was first on the witness stand?

MR. TIGHE: Yes.

THE COURT: Tell me the question.

MR. TIGHE: The questions I want to ask is, was she presented with the evidence that shows when she said there was no phone calls between --

THE COURT: Okay. Wait. Wait. Wait. She has to leave the courtroom.

(Victim exited courtroom.)

- 23 -

MR. TIGHE: Your Honor, was she here the whole time you were reading that?

THE COURT: I have no idea. I didn't see her. I don't know what time she came in. All right. So your question is? What's the question that you want to have asked -- that you want to ask?

MR. TIGHE: First of all, Your Honor, I would like to have it on the record you read off the transcript while the victim of the crime was here. I asked to have her sequestered. And I would ask for a mistrial.

THE COURT: I did not -- first of all, does anybody know -- go find out when she came in the courtroom.

MR. TIGHE: They were in here when I came in.

*Id*. at 226-28. The court denied his request for a mistrial, and permitted Appellant to recall J.E. She was shown the records, which indicated that she made phone calls during the time period between 10:06 p.m. and 10:10 p.m. to Appellant on the night of the rape. *Id*. at 237. She did not dispute the records but stated, "I just don't know why or how." *Id*. at 238. The records also established that a call was made from her phone at 10:22 p.m. that evening. J.E. agreed that the phone call occurred around the time she was assaulted, but denied making it.

With respect to his legal complaints, Appellant links all of these circumstances and rulings together. He posits that the trial court violated its own sequestration order by permitting the victim to remain in the courtroom following her testimony, which prejudiced all of his later attempts to impeach her. Additionally, he states that the delay in the recall ruling

hampered his case, because he did not know if he would be able to call J.E. for further cross-examination. Finally, he argues that a mistrial was warranted because J.E. heard her prior testimony and received a preview of the questions he sought to ask.

We disagree that the trial court abused its discretion in delaying its ruling on Appellant's motion; in requiring Appellant to explain why he wished to recall the witness; and in allowing the victim to remain in the courtroom throughout trial. With respect to the first two points, the trial court is permitted great latitude. As extensively discussed in the first issue, the trial court was clearly concerned that Appellant's attempt to recall J.E. may have been procedural gamesmanship designed to evade its ruling regarding personal cross-examination of J.E. Indeed, Pa.R.E. 611, Mode and Order of examining Witnesses and Presenting Evidence, states in pertinent part:

> **(a) Control by the Court; Purposes.** The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
>
> (1) make those procedures effective for determining the truth;
>
> (2) avoid wasting time; and
>
> **(3) protect witnesses from harassment or undue embarrassment.**

Pa.R.E. 611 (emphasis added). We find that requiring Appellant to explain the purpose of recalling J.E. did not constitute an abuse of discretion under these facts.

Furthermore, Appellant's decision to represent himself was a factor in these rulings. The trial court asked why Appellant did not simply impeach J.E. using the phone records during cross-examination, to which Appellant responded that the records were not authenticated at the time of her testimony. The Commonwealth noted in reply that it did not object to the admission of those records, which Appellant accomplished on cross-examination of a Commonwealth witness. The trial court responded, "If I had known that that's what you were waiting for, we would've let you do that out of order, just like the other witness. But to have her come back on the stand, that's not a light decision." N.T., 7/10/13, at 108. Thus, given the fact that the Commonwealth did not force Appellant to move the evidence into the record during his case-in-chief, it appears that any authentication dispute could have been resolved had Appellant simply conferred with the Commonwealth at the appropriate time. While Appellant correctly recognized an authentication objection to the records had he attempted to immediately impeach J.E., his ignorance of common professional courtesies, such as the stipulation to authenticity of documents whose provenance is not in dispute, largely explains the trial court's decision to defer its ruling. That failure strikes us as one of the pitfalls of proceeding *pro se*. Accordingly, we find no abuse of discretion.

Turning to the decision to permit J.E. to remain in the courtroom, we note that the court's sequestration order specifically stated that it applied

only until the witnesses testified. Once J.E. testified, the sequestration order had no effect.[11]

Finally, we address the refusal to grant a mistrial based on a violation of the sequestration order. We find no error, as we have determined that the sequestration request was limited to J.E.'s direct testimony. Assuming *arguendo* that Appellant's claim is not defeated by that point, we alternatively find no abuse of discretion. Appellant highlights that one remedy for a violation of a sequestration order is a mistrial. **See** Comment, Pa.R.E. 615 ("The trial court has discretion in choosing a remedy for violation of a sequestration order. Remedies include ordering a mistrial, forbidding the testimony of the offending witness, or an instruction to the jury.") (citations omitted). The fact that a trial judge **may** declare a mistrial

_____

[11] The trial court granted the Commonwealth's request to permit the victim to stay in the courtroom on the basis that victims have a right to be present at trial under the Pennsylvania Constitution. Our constitution does not appear to contain any such right, and the Crime Victims Act, 18 P.S. §§ 11.101-11.5102, likewise does not refer to any right to be present in the courtroom for trial. Many states, however, provide that right in their constitutions or by statute. **See** The Crime Victim's Right to Attend the Trial: The Reascendant National Consensus, 9 Lewis & Clark L. Rev. 481 (2005) (Beloof, Douglas, and Cassel, Paul).

We agree that the trial court's broad discretionary powers permit consideration of J.E.'s interest in observing the proceedings following her testimony, including the Commonwealth's assertion that the jury may look unfavorably upon the victim's absence. Moreover, we are unaware of any authority that gives a defendant the right to exclude a victim from the courtroom.

as a permissible sanction for violation of a sequestration order does not mean that the trial court **must** grant that remedy. A mistrial is required "only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." **Tejeda**, **supra** at 623. Appellant's only argument to that effect is that J.E. could tailor her testimony in response to his questions. However, as the Commonwealth noted at trial, the records spoke for themselves and Appellant fails to explain why there was a danger that J.E. could "explain away" these discrepancies.

## III.  Challenges to Appellant's Right to Counsel

The reordered sixth and seventh claims concern Appellant's decision to proceed *pro se*, which Appellant avers was not a free choice. It is well-settled that while an indigent defendant is entitled to counsel, "the right to appointed counsel does not include the right to counsel of the defendant's choice." **Commonwealth v. Albrecht**, 720 A.2d 693, 709 (Pa. 1998) (citation omitted).

We first review the circumstances concerning Appellant's court-appointed counsel. On June 5, 2012, the instant charges were held for trial at the Court of Common Pleas. The docket reflects that Public Defender Sandra Stepkovitch, Esquire, represented Appellant, and filed pre-trial motions on his behalf. Pretrial conferences were held on July 20, 2012, and August 8, 2012, before the Honorable Michael J. Barrasse, who was originally assigned to preside over this matter. The docket also indicates

that on February 15, 2013, Judge Barrasse entered an order appointing Christopher Osborne, Esquire, as standby counsel. Attorney Stepkovitch did not file a motion seeking withdrawal.

On February 19, 2013, the parties appeared for jury selection, with the Honorable Margaret Bisignani-Moyle presiding.[12] At this hearing, the Commonwealth informed Judge Bisignani-Moyle that Appellant had informed Judge Barrasse that he did not want his lawyer to represent him and indicated a desire to proceed *pro se*, resulting in Judge Barrasse appointing Attorney Osborne as standby counsel. At that juncture, Judge Bisignani-Moyle asked for a summary of what had occurred. Attorney Osborne stated:

> I went out to Mr. Tighe at the prison on February the 12th and had a meeting with him. Went over my appointment of standby counsel. Mr. Tighe did not approve of my appointment of standby counsel because I actually served in this role with Mr. Tighe once before back in, I think, 2002 or 2003. However, I did express to Mr. Tighe that the Court is not going to let him shop the bar for an attorney of his choosing and that I would probably remain as standby counsel.
>
> The next day on February 13, we appeared in front of Judge Barrasse. Judge Barrasse did explain to Mr. Tighe that, you know, he doesn't get to shop around. He either hires a private attorney, accepts me, or represents himself.
>
> At that time he chose to accept [me] as his court-appointed counsel. I then met with Mr. Tighe on the 13th and the 14th of last week. Friday I couldn't get to see him; Saturday I couldn't get to [see him] because of court personnel. I was able to meet

---

[12] The trial court opinion states that the case was transferred to Judge Bisignani-Moyle's courtroom, but does not indicate the reason.

with him yesterday. He indicated to me that he had the colloquy filled out. He was ready to proceed *pro se*. Judge, after he does go through the colloquy he has a number of -- he's made me aware of a number of pretrial motions he'd like to make.

I told him I didn't have to make them on his behalf. I would be more than happy to assist him. But once he is accepted as *pro se*, he can make his own motions.

N.T., 2/19/13, at 4-5. Attorney Osborne stated that he was prepared to proceed as Appellant's counsel. At that juncture, the trial court heard testimony from Appellant, who agreed with the summary of what occurred before Judge Barrasse. However, Appellant disputed that Attorney Osborne was prepared for trial and expressed a desire to proceed *pro se*. The judge reminded Appellant that trial would not commence until the next week, giving additional time for him and Attorney Osborne to discuss the case. The following conversation then occurred:

THE COURT: So even with the additional time and the expertise that Attorney Osborne brings to the table, you still don't want to have Attorney Osborne represent you?

MR. TIGHE: No.

THE COURT: Do you want to have the court appoint Attorney Osborne as standby counsel?

MR. TIGHE: If you want to.

THE COURT: Okay. He could stay and assist you in strategy, *voir dire,* things like that, but you would be doing the speaking. Do you understand?

MR. TIGHE: Yes.

THE COURT: Is that what you want?

MR. TIGHE: Yes.

THE COURT: I'm not familiar with your case from 2003, where apparently you either represented yourself or you represented yourself with the assistance of standby counsel. Which was it? Do you remember?

MR. TIGHE: It was, more or less, by myself. We didn't really get along at the time.

THE COURT: Okay. But have those arguments, or whatever disagreements there were, have they subsided?

MR. TIGHE: Yes.

*Id*. at 12-13. The court then conducted a lengthy colloquy to determine if Appellant was knowingly and voluntarily electing to proceed *pro se*. Thus, as of February 13, 2013, Appellant was acting as his own attorney.

Appellant now claims that he was "denied his right to counsel and he was appointed counsel with whom he had irreconcilable differences." Appellant's brief at 31-32. The source of that claim, however, does not relate to the aforementioned proceeding before Judge Bisignani-Moyle. Instead, he claims that he informed Judge Barasse that he "previously tried to sue Attorney Osborne for prior representation by him." Appellant's brief at 35. Appellant apparently equates that statement to a motion seeking appointment of new counsel on the basis of irreconcilable differences. However, Appellant did not inform Judge Bisignani-Moyle of this complaint, and he recognizes this fact as he claims that the trial court "**seemed to be aware** of Appellant's claimed conflict with Attorney Osborne since it

referenced what Appellant stated on February 13." ***Id***. (emphasis added).

Aside from sheer speculation that Judge Bisignani-Moyle was privy to what was discussed at the February 13 hearing—an unlikely circumstance given the fact that the judge asked the parties to tell her what happened at that proceeding—the only other citation to the record offered by Appellant in reference to this conflict comes from a statement he made immediately prior to commencement of trial.

> Q. I would, again, urge you to consider permitting counsel to represent you and for you to assist counsel and provide a full defense on your behalf. Do you understand that I have suggested that you consider permitting counsel to represent you?
>
> A. Your Honor, just for the record, I stated many of times, I'd like to have counsel represent me, but me and Mr. Osborne don't get along. I don't trust him with my defense.
>
> Q. You haven't stated that.
>
> A. Yes, I did; a couple times.
>
> Q. No, you haven't. You've asked for different standby counsel.
>
> A. Yes.

N.T., 7/8/13, at 47.

Having set forth the factual background, we turn to Appellant's legal arguments. He claims that the "irreconcilable differences" between him and Attorney Osborne effectively forced Appellant to represent himself. Appellant's argument largely relies upon ***Commonwealth v. Smith***, 626 A.2d 614, 619 (Pa.Super. 1993).

- 32 -

*Smith* is readily distinguishable. Therein, **counsel** filed a motion to withdraw, citing irreconcilable differences with her client. Smith also "vehemently sought the withdrawal of [counsel]." *Id*. at 616. The trial court denied the motions and instead entered an order stating Smith would either continue with counsel or represent himself. Appellant elected to represent himself, with counsel acting as standby counsel. We reversed, finding that the trial court "effectively forc[ed] [Smith] to proceed *pro se*," thus denying him the right to counsel. *Id*. at 620.

*Smith* is thus inapposite, as Appellant was not "forced" to proceed *pro se* through an improper denial of a motion to appoint alternative counsel. Unlike Smith, Appellant herein informed the trial court that he wished to proceed *pro se*. Indeed, in *Smith*, our holding did not turn on whether the trial court abused its discretion in ruling on the motion for substitute counsel; instead, we found that the waiver of counsel was not knowing or voluntary:

> Instantly, we find that appellant did not tender a knowing and voluntary waiver of his right to counsel. No colloquy was conducted to inform appellant, *inter alia,* of the permissible range of punishments, possible defenses, and the danger of permanently losing his right to assert defenses and other rights if they are not raised at trial. Rather he was merely given a choice between proceeding by himself or with counsel in whom he had no confidence and who had herself filed a petition to withdraw. Accordingly, we find that by effectively forcing appellant to proceed *pro se*, the trial court denied appellant his constitutionally guaranteed right to counsel.

*Id*. at 619–20 (footnotes omitted).  That error in **Smith** required a new trial, notwithstanding whether there was an actual conflict entitling the defendant to a different attorney.

**Commonwealth v. Neal**, 563 A.2d 1236 (Pa.Super. 1989), cited and discussed in **Smith** as supporting its holding, demonstrates that there is no issue with denying a motion to appoint substitute counsel on the basis of a spurious conflict.  Therein, following jury selection, but before trial, the trial judge received a letter from Neal stating that he wanted his public defender dismissed and new counsel appointed.  The trial court thereafter discussed the matter on the record, with Neal stating, "I don't have the confidence that [appointed counsel] is going to represent me correctly."  *Id*. at 1239 (quoting transcript).  The court responded, "I'm going to honor your request, I'm going to relieve [counsel] of her representation in this case. It makes no sense to have her represent you if you don't have confidence in her, but I'm following up with what I just told you, I'm not going to appoint other counsel to represent you." *Id*. at 1240.  Neal objected, stating he had no ability or desire to defend himself.  The trial court nevertheless ordered him to proceed *pro se*.

On appeal, we reversed.  As it pertains to the issue herein, we stated that the error was excusing counsel instead of informing Neal that he was not entitled to a different attorney.

It is not difficult to empathize with the trial court's frustration when appellant, after a jury already had been selected, sought the dismissal of his lawyer and the appointment of new counsel. Appellant was unable to demonstrate irreconcilable differences between himself and his lawyer, and his request to replace counsel may well have been calculated to delay the trial. **Under the circumstances, the trial court would not have abused its discretion by denying appellant's request to dismiss his public defender**. The trial court committed error, however, when it excused counsel from representing appellant and forced appellant to proceed *pro se*. **That appellant did not want to proceed *pro se* is clear**. He told the court that he did not know how to defend himself and had no knowledge regarding "motions, how to do anything along these lines." In the face of this, it is clear that appellant did not voluntarily waive the right to be represented by counsel. Instead, he was literally forced by the court to represent himself without being apprised of the consequences and pitfalls thereof. This, the courts have refused to countenance.

*Id*. at 1242–43 (emphases added).

Thus, *Neal* is likewise distinguishable, as these circumstances do not concern the removal of counsel but rather a claim that the trial court somehow erred by failing to appoint new counsel in the absence of an irreconcilable conflict. Instantly, Appellant asked to proceed *pro se* and waived his right to counsel, as opposed to seeking removal of counsel on the basis of a conflict.

Perhaps recognizing that the cases are distinguishable on this basis, Appellant argues in the alternative that the waiver of his right to counsel was invalid due to the trial court's failure to inquire regarding this purported conflict. We disagree. Appellant neglected to alert the trial court to any perceived conflict between him and Attorney Osborne, and he fails to cite

any case that holds a valid waiver of the right to counsel requires the trial court to *sua sponte* ask if any type of conflict motivated the request. "To make a knowing and intelligent waiver, the defendant must be aware of both the right and of the risks of forfeiting the right to counsel." **Commonwealth v. Doyen**, 848 A.2d 1007, 1012 (Pa.Super. 2004). Furthermore, even if legally viable, this claim is meritless since Appellant was asked if there was any remaining disagreement between him and Attorney Osborne. He said that there was not. Since Appellant denied any conflict with Attorney Osborne when given the opportunity to inform of any such issue, we therefore find that Appellant failed to establish that his right to counsel was violated.

## IV. Expert witness claim

Appellant's eighth claim is that the trial court abused its discretion in denying his request for an independent expert "to conduct independent testing, DNA testing and/or to assist him in his defense[.]" Appellant's brief at 44. We apply the following principles to this type of claim.

> It is well-established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. The state has an affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them. Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense.

*Commonwealth v. Machicote*, 172 A.3d 595, 604 (Pa.Super. 2017) (quoting *Commonwealth v. Konias,* 136 A.3d 1014, 1019 (Pa.Super. 2016)). As we stated in *Commonwealth v. Curnutte*, 871 A.2d 839 (Pa.Super. 2005):

> It is true that the Commonwealth is not obligated to pay for the services of an expert simply because a defendant requests one. *See Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61, 73 (1994); [*Commonwealth v. Gelormo*, 475 A.2d 765 (Pa.Super. 1984)]. There must be some showing as to the content and relevancy of the proposed expert testimony before such a request will be granted. *See Commonwealth v. Bell,* 706 A.2d 855, 862 (Pa.Super.1998).

*Id*. at 842. Finally, "[t]he provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court and a denial thereof will not be reversed absent an abuse of that discretion." *Commonwealth v. Cannon*, 954 A.2d 1222, 1226 (Pa.Super. 2008) (quoting *Albrecht*, *supra* at 707).

We first set forth the additional facts pertinent to this issue. Following Appellant's decision to proceed *pro se*, he requested an independent DNA test as the Commonwealth intended to introduce DNA evidence regarding saliva recovered from J.E.'s neck and breast. Appellant's motion for "independent testing" was, in truth, a request for an expert witness to assist him in cross-examination. We begin by quoting the initial discussion of this topic, which occurred on February 21, 2013:

THE COURT: Motion for writ of habeas corpus for an independent DNA test. Sir, this is your opportunity to persuade to me why you should be granted independent testing of the DNA.

THE DEFENDANT: Your Honor, it's my 14th amendment right to due process to call a witness on my behalf. They're calling two DNA specialist[s]. I'm not a DNA specialist. I should have someone in my, on my team, that I can have testify as to the DNA sample, too, and the sampler. Like I'm not a DNA specialist. Like they can be talking Greek and I wouldn't understand nothing. They have two. They're calling two DNA specialists. They're saying that the only DNA, a lot of it came back negative. The only positive DNA was a neck swab and a breast swab. Now I can't argue because I'm not a DNA specialist, that if there was saliva on the neck and she removed the clothe[s] or put her clothes on, they transferred from the neck to the breast like –

THE COURT: But right there, you're showing that you have the ability to ask questions effectively on cross –

THE DEFENDANT: Yeah, but I can't argue the technicality of it, Your Honor, like a DNA specialist could. And how do I not know that their DNA was swabbed. Like I don't know how to break -- to go about questioning a DNA specialist. Like they start talking FD-256; like I'm lost. So I feel that I should have a DNA analyst on my team, too[.]

N.T., 2/21/13, at 28-29. The next day, the Commonwealth consented to Appellant's motion to postpone the case, due to the fact that a brown pubic hair was recovered during a rape kit examination but was not tested. Appellant agreed to have pubic hair samples taken for DNA purposes. Appellant asked that everything be retested: "I would like to have it all redone, neck swab and the breast swab." N.T., 2/22/13, at 4. The trial court denied that request, stating that the Pennsylvania State Police would

test the pubic hair first, and informed Appellant that he could renew his motion for independent testing depending on the results.

On July 3, 2013, the parties appeared for additional pre-trial motions, at which Appellant sought to suppress the DNA evidence. The trial court and Commonwealth summarized what was determined by the additional testing:

> THE COURT: Okay, so in this case what they're saying is that when they tested the hair, they discovered that there was DNA on or in the hair itself from two or more people.
>
> MR. TALERICO: Correct.
>
> THE COURT: Am I reading that correct?
>
> MR. TALERICO: Correct. And the two people that were identified or were able to be identified were Mr. Tigue[13] and the victim, [J.E.].
>
> . . . .
>
> THE COURT: Okay, basically they're saying that based on statistical probability, the hair consists of DNA from two --
>
> MR. TALERICO: Two sources.
>
> THE COURT: And based on their known sources, I just want to make sure I understand what you're saying.
>
> MR. TALERICO: Sure.
>
> THE COURT: They're saying based on the known sources that they have, because they have a swab from Mr. Tigue and presumably a swab from [J.E.]?

_____

[13] Some transcripts refer to Appellant as Patrick Tigue, while the certified documents use the Tighe spelling.

MR. TALERICO: From [J.E.].

THE COURT: They're saying that the DNA on this hair from the two sources is consistent with the DNA of Mr. Tigue and the DNA of [J.E.].

MR. TALERICO: Perfect.

N.T., 7/3/13, at 30-34. Appellant believed that the further testing was for purposes of comparing his pubic hair to the hair recovered from the rape kit, and complained that proper DNA testing could definitively match whether the pubic hair taken from him was the same as the hair recovered from the kit. "If they were going to take a hair, there wouldn't be a conclusion of two DNAs, it would be one DNA. A hair can only have one possible DNA." The trial court accurately identified Appellant's misapprehension, informing him that "[W]hat you're missing the point, sir, is that apparently there's bodily fluid or skin cells on the hair from a person other than the person who belongs to the hair." *Id*. at 36. The trial court denied the suppression motion and Appellant did not renew his motion for independent testing.

We now apply the foregoing principles to this claim. We first note that Appellant made two separate requests. The first was the motion for independent testing of the already-completed DNA testing. The second was a motion for an expert to assist with his cross-examination. As to the former claim, we find that it is waived since he did not renew his motion for

independent testing following the further pubic hair analysis.[14]  Next, we find that Appellant has failed to establish that he is entitled to the appointment of an expert to assist him with understanding and cross-examining the Commonwealth's DNA expert.  We find that his inability to do so is directly attributable to his lack of expertise, which is a risk associated with the decision to proceed *pro se*.  In fact, it is commonly stated that attorneys are not ineffective for failing to obtain independent experts when effective cross-examination can elicit helpful testimony.  ***See Commonwealth v. Showers***, 782 A.2d 1010, 1021 (Pa.Super. 2001).  Hence, this claim fails.

## V.  Impeachment claim

Appellant's reordered ninth claim concerns the trial court's ruling on a Commonwealth objection made after Appellant attempted to impeach the victim's sister.  On cross-examination, Appellant asked M.L., the victim's sister, if she was impaired when J.E. reported the rape.  Appellant then stated, "Did we have a chance to meet each other earlier in that day on the 29th?"  N.T., 7/9/13, at 120.  The Commonwealth objected and at sidebar Appellant explained that he was with M.L. and the victim on the day in

_____

[14] Even if preserved, we would deem the claim meritless.  Appellant's desire to have the evidence retested is impossible to separate from his argument that he was entitled to an expert to assist with his cross-examination.  Thus, Appellant failed to make the required "showing as to the content and relevancy of the proposed expert testimony[.]"  ***Commonwealth v. Bell***, 706 A.2d 855, 862 (Pa.Super. 1998).

question, and M.L. bought and consumed drugs in his presence, thereby establishing that she was possibly impaired later that evening. *See* ***Commonwealth v. Small***, 980 A.2d 549, 570 (Pa. 2009) (jury may not consider drug use by witnesses for impeachment purposes, but may if the intoxication pertains to time of occurrence about which witness testified). The Commonwealth responded that its pre-trial motion to introduce evidence that drug use was part of the relationship between Appellant and the victim was denied. The trial court agreed, stating "[w]hat's good for the goose is good for the gander." N.T., 7/9/13, at 126. Following more discussion, the trial court remarked, "[Y]ou're going to withdraw your question for now, is that what you're telling me?" *Id*. at 126-27. Appellant agreed, and when the sidebar concluded Appellant stated, "I withdraw that question, Your Honor." *Id*. at 127.

Appellant now argues that his question was directly addressed to M.L.'s ability to perceive and recall the actual events she testified to, as opposed to introducing general evidence concerning drug use and its role in his relationship to the victim and her sister. We agree with the trial court that Appellant waived any objection to the trial court's ruling by withdrawing the question. While Appellant claims he was forced to do so by the trial court stating "[Y]ou're going to withdraw your question," we agree that Appellant could have preserved his objection by disagreeing. Moreover, Appellant then repeated in open court that he would withdraw the question.

*See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

## VI.  Sentencing Claims

Appellant's remaining arguments all pertain to sentencing.  He argues that the trial court abused its discretion by failing to appoint an expert for his sexually violent predator ("SVP") hearing.  Second, he avers that the crimes of sexual assault and rape merge.  Third, he asserts that the trial court vindictively increased his sentence when resentencing him.  We vacate the SVP designation, vacate judgment of sentence, and remand for resentencing.

Following briefing in this matter, we issued ***Commonwealth v. Butler***, 173 A.3d 1212 (Pa.Super. 2017).  ***Butler*** applied ***Commonwealth v. Muniz***, 164 A.3d 1189 (Pa. 2017), which held that the sexual offender requirements under the Sexual Offender Registration and Notification Act, including its SVP framework, constitute punishment.  ***Butler*** determined that, as a result of ***Muniz***, the SVP procedure is subject to the constitutional requirement that the facts constituting that punishment must be found by a fact-finder beyond a reasonable doubt.  Thus, 42 Pa.C.S. § 9799.24(e)(3), which requires the trial court to find the relevant facts by clear and convincing evidence, was deemed unconstitutional.  ***Id***. at 1218.  As ***Butler*** explained:

As the sole statutory mechanism for SVP designation is constitutionally flawed, there is no longer a legitimate path forward for undertaking adjudications pursuant to section 9799.24. As such, trial courts may no longer designate convicted defendants as SVPs, nor may they hold SVP hearings, until our General Assembly enacts a constitutional designation mechanism. Instead, trial courts must notify a defendant that he or she is required to register for 15 years if he or she is convicted of a Tier I sexual offense, 25 years if he or she is convicted of a Tier II sexual offense, or life if he or she is convicted of a Tier III sexual offense.

*Id*. at 1218 (citation and footnote omitted).

Since **Butler** finds that this issue pertains to the legality of the sentence, which we may reach *sua sponte*, we find that Appellant's sentence illegally included an SVP designation. In **Butler**, the SVP designation resulted in an increase of his registration requirements. "In this case, if [Butler] were not designated an SVP, he would be required to register for only 15 years. In other words, the SVP designation increased [his] registration exposure from 15 years to life." **Id**. at 1215-16 (citations and footnotes omitted). Since Appellant was convicted of a Tier III offense, he is still required to register for life. **See** 42 Pa.C.S. § 9799.14 (classifying rape as a Tier III offense). Hence, we vacate Appellant's SVP designation.

Next, we address the assertion that his sentences for rape and indecent assault merge. The trial court agreed and asks this Court to vacate the sentence, while the Commonwealth states that the sentences "probably" merge. Commonwealth's brief at 59. For the following reasons, we disagree with Appellant and the trial court with respect to the crimes of rape and

indecent assault. However, we find that the sentences for IDSI and indecent assault merge.

We first set forth the statutory text for the crimes identified by Appellant. The crime of rape reads:

> **(a) Offense defined.--**A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant:
>
>> (1) By forcible compulsion.
>>
>>      . . . .

18 Pa.C.S. § 3121(a)(1). As to indecent assault, Appellant was charged with violating the following subsection:

> **(a) Offense defined.--**A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:
>
>>      . . . .
>
> (8) the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.

18 Pa.C.S. § 3126. Additionally, "indecent contact" is defined to include "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in either person." 18 Pa.C.S. § 3101.

"A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence. Therefore, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Nero**, 58 A.3d 802, 806 (Pa.Super. 2012) (quoting **Commonwealth v. Quintua**, 56 A.3d 399, 400 (Pa.Super. 2012)). Whether sentences merge is governed by statute:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

The trial court opined that these crimes merge due to the fact that "the act upon which indecent assault is predicated has already been taken into account by the rape or involuntary sexual assault and merges[.]" Trial Court Opinion, 4/10/17, at 40. As to that facet of the merger analysis, we agree. **See Commonwealth v. Lomax**, 8 A.3d 1264 (Pa.Super. 2010) (engaging in vaginal intercourse with child met requirement of sexual intercourse for rape of a child as well as "indecent contact" for indecent assault). However, the trial court's inquiry was incomplete, as that analysis only accounted for whether "the crimes arise from a single criminal act[.]" 42 Pa.C.S. § 9765. Appellant did not address whether the second requirement, that "all of the statutory elements of one offense are included

- 46 -

in the statutory elements of the other offense," was met. Therefore, we conclude that Appellant's argument is waived.[15]

Nevertheless, legality of sentence may be raised *sua sponte*, and we find that the charged subsection of indecent assault merged with the charged subsection of IDSI. The latter statute reads:

**(a) Offense defined.--**A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant:

. . . .

(7) who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other.

18 Pa.C.S. § 3123.[16]

_____

[15] It would appear that the crimes do not merge under the statute. ***See Commonwealth v. Baldwin***, 985 A.2d 830 (Pa. 2009) (crime of carrying a firearm without a license did not merge with crime of carrying firearm in Philadelphia without a license; while the crimes had the shared element of a lack of license, each crime included an element the other did not). Here, the crime of rape required proof of sexual intercourse by forcible compulsion, whereas indecent assault under § 3126(a)(8) does not require any proof of force. Additionally, indecent assault required proof that J.E. was less than sixteen years of age; that Appellant was four or more years older; and that the two were not married, whereas rape does not. Thus, each crime requires proof of at least one element that the other does not. ***See Commonwealth v. Parham***, 969 A.2d 629 (Pa.Super. 2009) (rape and statutory sexual assault do not merge, as the latter crime requires proof that the complainant is under sixteen years of age, perpetrator is at least four years older, and that the complainant and perpetrator are unmarried, while former requires proof of forcible compulsion or threat thereof).

"Deviate sexual intercourse" is defined as "Sexual intercourse per os or per anus between human beings[.]" 18 Pa.C.S. § 3101. Proof of the "deviate sexual intercourse" requirement of § 3123(a)(7) satisfies the "indecent contact" element of § 3126(a)(8). Thus, proof of involuntary deviate sexual intercourse with a person under sixteen necessarily proved indecent assault of a person under sixteen. Accordingly, the convictions merge for sentencing purposes. *See Commonwealth v. Brown*, 159 A.3d 531 (Pa.Super. 2017) (rape of a child merged with IDSI of a child). Since the trial court imposed a consecutive sentence on the charge of indecent assault, our finding disrupts the sentencing scheme and requires that we vacate the judgment of sentence and remand for resentencing.[17]

*(Footnote Continued)* ────────────

[16] The public docket sheet states that Appellant was convicted of 18 Pa.C.S. § 3123(b), which criminalizes deviate sexual intercourse "with a complainant who is less than 13 years of age." J.E. was fifteen years old, and hence Appellant could not be convicted of this crime. We have reviewed the jury instructions and verdict slip, both of which show that Appellant was, in fact, convicted of 18 Pa.C.S. § 3123(a)(7).

[17] We note that Appellant committed the instant crimes on May 29, 2012, prior to the enactment of the Sexual Offender Registration Notification Act, which became effective December 20, 2012, but was sentenced after its effective date. In *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017), our Supreme Court held that application of SORNA constituted an *ex post facto* violation when a previous version was in effect "at the time of his offense and conviction." *Id*. at 1193. Herein, the law changed between the commission of Appellant's criminal conduct and sentencing, and Appellant would presumably be entitled to relief under *Muniz*. *See e.g. Peugh v. United States*, 133 S.Ct. 2072 (2013) (*ex post facto* violation where a
*(Footnote Continued Next Page)*

Appellant's final complaint is that the trial court vindictively resentenced him when it imposed a consecutive sentence at indecent assault, whereas the original scheme called for a concurrent sentence. Since we have vacated judgment of sentence on the merger basis, we need not reach this issue.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/12/2018

*(Footnote Continued)* —————————

defendant was sentenced under federal guidelines promulgated after the commission of his criminal acts).

Since Appellant is entitled to resentencing the parties may address this issue at that juncture, and we note that the Legislature has amended SORNA, effective February 21, 2018, to address **Muniz**. **See e.g.** 42 Pa.C.S. §§ 9799.51 – 9799.75.