
Filed
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee,

**v.**

## STEFAN KEANU CAMACHO,
Defendant-Appellant.

Supreme Court Case No. CRA25-008
Superior Court Case No. CF0019-24

## OPINION

## Cite as: 2025 Guam 16

Appeal from the Superior Court of Guam
Argued and submitted on May 30, 2025
Hagåtña, Guam

Appearing for Defendant-Appellant
Stephen P. Hattori, *Esq.*
Public Defender
Public Defender Service Corporation
779 Route 4
Sinajana, GU 96910

Appearing for Plaintiff-Appellee
Emily L.A. Rees, *Esq.*
Assistant Attorney General
Office of the Attorney General
Appellate & Writing Division
134 W. Soledad Ave., Ste. 412
Hagåtña, GU 96910


E-Received
12/30/2025 3:33:15 PM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**CARBULLIDO, J.:**

[1]    Defendant-Appellant Stefan Keanu Camacho appeals a decision of the Superior Court granting the People's request to allow a government witness to testify remotely at his murder trial. Guam's former Medical Examiner Dr. Jeffrey Nine performed the autopsy of the alleged victim in this case. Dr. Nine testified that he lives in Ohio and that, given the medical conditions of his wife and child, he cannot travel. Camacho argues that the trial court's decision violates his Sixth Amendment right to confront the witnesses against him.

[2]    The right to confrontation must be zealously protected, but the Sixth Amendment does not categorically require in-person, face-to-face confrontation in all cases. The trial court applied the correct legal standard. We narrowly hold that upon the unique facts on the record before us, Dr. Nine's remote testimony is necessary to further an important public policy that outweighs Camacho's right to in-person, face-to-face confrontation. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[3]    Camacho is charged with Complicity to Commit Aggravated Murder, among other offenses. Dr. Nine is the former Medical Examiner of Guam, who performed the autopsy of the alleged victim.[1] Dr. Nine has since relocated to Columbus, Ohio.

[4]    The People filed a motion for relief, requesting that either Dr. Nine be allowed to testify at trial remotely via two-way video conferencing, or a continuance be granted so that Dr. Nine could be deposed. The People argued that Dr. Nine is uniquely able to testify about the deceased's cause of death because he performed the autopsy alone, and it was not recorded. The People supported

---

[1] The People represent that Dr. Nine has performed autopsies in over a dozen other matters currently pending before the Superior Court.

their motion with a sworn declaration from Dr. Nine, in which he claimed that he cannot travel to Guam to testify because he is a caretaker for his wife and child, who have serious health issues. Dr. Nine elaborated that his wife and child "require treatment several times a week for their medical conditions and they require my continual assistance while they undergo their respective medical care and treatment," and that his traveling to Guam would "place the medical care and treatment of my wife and child in life threatening peril." Record on Appeal ("RA"), tab 57 at 2 (Decl. Dr. Nine, Jan. 27, 2025).

[5]     Camacho opposed the motion, expressing concerns that "the failure to produce Dr. Nine in person would lead to a violation of [the] Sixth Amendment right to confront witnesses." RA, tab 63 at 2 (Dec. & Order, Feb. 25, 2025) (alteration in original) (quoting RA, tab 58 (Opp'n Mot., Feb. 10, 2025)). Camacho also argued that videoconferencing could distort nonverbal cues and that videoconference technology cannot replace eye contact among the witness, defendant, and jurors.

[6]     The trial court issued an order stating that "[b]ased on the current filings from the parties and the Court's own research, the Court believes it is necessary to hold an evidentiary hearing on the issue." RA, tab 60 at 1 (Order for Evid. Hr'g, Feb. 19, 2025). The trial court's order also summarized the law governing remote testimony and depositions, requesting that the parties address "how this law applies to this case at the evidentiary hearing." *Id.* at 2. The court observed that:

> The last time [remote testimony] was addressed by the U.S. Supreme Court was in 1990, in *Maryland v. Craig*. According to the Supreme Court, "though we reaffirm the importance of face-to-face confrontation with witnesses appearing at trial, we cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." The Court goes on to say that this "does not, of course, mean that it may easily be dispensed with." In *United States v. Yates*, the Eleventh Circuit Court of Appeal put forth the following test for when face to face confrontation may be dispensable: "The court generally must: (1) hold an evidentiary hearing and find (a) that the denial of

physical, face-to-face confrontation at trial is necessary to further an important public policy and (b) that the reliability of the testimony is otherwise assured." To allow for any testimony that is not done face-to-face, the trial court must find that it is "essential to deny the defendant his right to face-to-face physical confrontation in order to serve the interest the government asserts."

*Id.* at 2-3 (first quoting *Maryland v. Craig*, 497 U.S. 836, 845 (1990); and then quoting *United States v. Yates*, 438 F.3d 1307, 1315 (11th Cir. 2006) (en banc)). The court also observed that 8 GCA § 70.55 requires the presence of a defendant at a deposition and requested that the parties address whether the presence of Camacho at the deposition would be feasible.

[7]     Dr. Nine testified at the evidentiary hearing on the motion. The hearing was attended by attorneys who represented three different defendants in cases where Dr. Nine had performed an autopsy. Dr. Nine testified that he could not leave his family to attend multiple trials in Guam because of their serious medical conditions. Information regarding his wife and son's diagnoses was submitted to the trial court for *in camera* review. Dr. Nine testified that his wife requires "daily high-dose medications and weekly injections" and that the high-dose medications "affect[] her ability to do things outside of the home because it makes her severely immunodepressed and immunocompromised, so she can catch infections very easily." Transcript ("Tr.") at 7 (Mot. Hr'g, Feb. 24, 2025). He further testified that he administers her weekly injections. *Id.* Dr. Nine testified that because of his wife's medical condition, "she does not drive a vehicle, . . . and she does not go to . . . places." *Id.* at 7-8. He also stated that his wife's condition affects her vision: "It causes blurriness and times where she can't see, but it has not yet progressed to permanent blindness . . . ." *Id.* at 8.

[8]     Dr. Nine further testified that his son "requires 24-hour care because of his quadriplegia and severe cerebral palsy." *Id.* at 9. Dr. Nine explained that his son:

is a Guam native. He's of Chamorro origin, or ancestry, and he had very severe medical conditions that required 24-hour care. In May of 2023, we were meeting with the Child Services Division to do some foster care, and they asked us if we

would take this child, who had nowhere to go. My wife is a nurse, me, being a physician, we decided to take him, and we took him into our home on July of 2023. He had very severe medical conditions that we had to [sic] difficulty treating on the island. He eventually was hospitalized for almost two months in February and March of 2024, and at that time we realized he – we did not – we could not get the medical care and the medications that he needed on Guam.

*Id.* at 6-7. Dr. Nine explained that in addition to 24-hour care, his son "requires three therapy sessions every week, like, physical therapy and occupational therapy and speech therapy." *Id.* at 9. Dr. Nine testified that his wife takes care of their son "while I'm at work, and then I take care of him the rest of the time." *Id.* at 15. He testified that they had no family or close friends in Ohio who could help to care for his wife and son in his absence. *See id.* at 8.

[9]     On cross-examination, Dr. Nine stated that after he had moved to Ohio (but was still under contract as the medical examiner), he had traveled to Guam three times "to do autopsies under my own schedule" which was "essentially, over weekends." *Id.* at 11. Dr. Nine also stated he believed he would not be reimbursed for his travel or expenses and may have to go into debt to attend trials in person. *Id.* at 12, 14. On redirect, Dr. Nine clarified that his decisions about traveling to Guam for trial were based "[b]y far, a hundred percent . . . [on the] medical circumstances" of his wife and child. *Id.* at 14. He testified that "[t]he financial concerns I could eventually work out. I'd prefer not to go into debt, and try to compensate myself for that travel, . . . but by far the medical circumstances are the reason." *Id.* Dr. Nine did not explicitly state he would resist a subpoena but testified that he "would certainly try to find other ways to get around active traveling." *Id.* at 9.

[10]     The trial court ultimately granted the People's motion for remote testimony. The trial court concluded that the People had made the requisite showing under *Craig* that taking Dr. Nine's remote testimony is necessary to further an important state interest and that the testimony would be reliable. Relying on a California Court of Appeal decision, the trial court found that "ensuring the safety of Dr. Nine's wife and child qualifies as an important public policy, particularly given

the large distance between Guam and Ohio and the unique circumstances requiring his physical presence." RA, tab 63 at 5-6 (Dec. & Order) (citing *People v. Coulthard*, 307 Cal. Rptr. 3d 383, 411 (Ct. App. 2023)). The trial court further found that "the People have met their burden of ensuring that testimony received via live, two-way, audio-video telecommunication is reliable. This procedure preserves most, if not all elements critical to the confrontation clause, which have a combined effect of ensuring reliability of the evidence." *Id.* at 7. The trial court found that remote testimony "constitutes the best scenario for meeting the needs and rights of all parties" and rejected a deposition because of "the significant delays that would be associated with a deposition taking place in Ohio." *Id.* at 6-7.

[11]    Camacho filed a petition for permission to file an interlocutory appeal challenging the trial court's order on Sixth Amendment grounds. The People did not oppose the petition, which this court granted.

## II.  JURISDICTION

[12]    This court has the discretion to grant permission to file an interlocutory appeal in a criminal case under 7 GCA § 3108(b). *See People v. Lau*, 2007 Guam 4 ¶ 3 (citing 7 GCA § 3108(b)(1), (3) (2005)); *see also* 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 119-59 (2025)); 7 GCA § 3107 (2005). This court previously granted Camacho's unopposed petition for permission to appeal because it presented a question of law that will "clarify further proceedings" in the litigation and "clarify issues of general importance in the administration of justice." Order at 1 (Apr. 4, 2025).

## III.  STANDARD OF REVIEW

[13]    "We review evidentiary rulings implicating constitutional rights, including the right to confront witnesses, *de novo*." *People v. Cepeda*, 2021 Guam 9 ¶ 21.

## IV. ANALYSIS

[14]    Camacho argues that "[s]etting aside the 6th Amendment right of a defendant to have a physical, face-to-face confrontation at a trial must require more than a mere showing of inconvenience to a witness" and requests that this court determine that "allowing Dr. Nine's testimony via videoconference violates the Confrontation Clause of both the Constitution and the Organic Act of Guam." Appellant's Br. at 17 (Apr. 11, 2025).[2] The People respond that the right to confrontation "must 'be interpreted in the context of the necessities of trial and the adversary process'" and that "the right to face-to-face confrontation is not absolute." Appellee's Br. at 3 (May 7, 2025) (quoting *Craig*, 497 U.S. at 850). They argue that the U.S. Supreme Court's landmark decision in *Maryland v. Craig*, 497 U.S. 836 (1990), governs the admissibility of remote, two-way video testimony of an adult witness introduced against a criminal defendant. Appellee's Br. at 2. We agree with Camacho that showing mere inconvenience to a witness is insufficient to deny a criminal defendant the right to in-person, face-to-face confrontation. *See* Appellant's Br. at 17. However, that is not the end of the analysis.

[15]    "The Sixth Amendment's Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .'" *People v. Kotto*, 2020 Guam 4 ¶ 15 (alterations in original) (quoting U.S. Const. amend. VI). "The Organic Act of Guam both specifically incorporates the Sixth Amendment's Confrontation Clause, and provides an independent right for criminal defendants 'to be confronted with the witnesses against him.'" *Id.* (quoting 48 U.S.C.A. § 1421b(g)) (citing 48 U.S.C.A. § 1421b(u)).

---

[2] Beyond passing references to the Organic Act, Camacho does not make any arguments that the remote testimony in this case is inorganic on independent grounds, so we address only the Sixth Amendment.

[16]     As a threshold matter, we must decide whether the Supreme Court's *Craig* decision is the correct standard to apply when the People seek to have an adult witness testify via two-way video. We join the majority of jurisdictions that have found *Craig* applies to scenarios such as this and adopt *Craig* as the correct legal standard.

[17]     Applying *Craig*, we must then decide whether the People met their burden of showing, and the trial court made the requisite findings, that the remote testimony is necessary to further an important public policy and is otherwise reliable. *See Craig*, 497 U.S. at 855-56. We rule on the unique facts in the record before us and hold that the People have met their burden and the trial court's findings are adequate.[3]

## A. *Craig* Remains Good Law and Applies to Two-Way Video Testimony of an Adult

[18]     Camacho's opening brief correctly identifies that applying *Craig* here would extend its holding beyond child witnesses. Appellant's Br. at 11-12. The People also acknowledge that adopting *Craig*—which "dealt with one-way, closed-circuit testimony of a child witness accusing the defendant of sexual abuse"—would technically be an expansion beyond that case's holding; but they argue, "A broader application of the *Craig* standard is appropriate to ensure crucial evidence at trial." Appellee's Br. at 2, 4. The People further argue that "[w]hile Guam has yet to apply the *Craig* standard to cases beyond child witnesses in sexual abuse cases, . . . doing so is consistent with this Court's precedent." *Id.* at 8. However, neither party's brief discusses in much

---

[3] *Craig* requires a "case-specific" determination in *all* cases. *Maryland v. Craig*, 497 U.S. 836, 838 (1990). Although we affirm the trial court's decision to allow Dr. Nine to testify remotely at Camacho's trial, we do not hold that he will automatically be permitted to testify remotely in all future cases where he performed an autopsy. Every time the People seek to have a witness testify remotely at trial over a defendant's objection, a hearing is required. And every time, the People bear the burden of showing denial of in-person, face-to-face confrontation is necessary to further an important public policy. Nothing in our opinion should be construed as preventing defendants from vindicating their Sixth Amendment rights or relieving the People of their burden in future cases—including cases where Dr. Nine is expected to testify. Our opinion identifies several public policy concerns to consider in these future cases, and circumstances may change.

detail the possibility that *Craig* is inconsistent with subsequent Sixth Amendment jurisprudence of the U.S. Supreme Court: *Crawford v. Washington*, 541 U.S. 36 (2004).[4]

[19]     Generally, under the Sixth Amendment, "defendants have the right to be physically present and face-to-face with witnesses testifying against them." *People v. Morales*, 2022 Guam 1 ¶ 15 (citing *Craig*, 497 U.S. at 849-50); *see also State v. Rogerson*, 855 N.W.2d 495, 498 (Iowa 2014) ("Courts have long construed the Confrontation Clause to 'guarantee [] the defendant a face-to-face meeting with witnesses appearing before the trier of fact.'" (alteration in original) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988))).   However, as this court has acknowledged, a "defendant's right to confrontation is not absolute." *Morales*, 2022 Guam 1 ¶ 15; *see also Rogerson*, 855 N.W.2d at 499 ("[T]he Supreme Court has clarified that while the Confrontation Clause does express a strong preference for face-to-face confrontation, the latter is not an absolute constitutional requirement." (citing *Craig*, 497 U.S. at 849-50)).   This court has opined that the fact "[t]hat the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with." *People v. Callahan*, 2018 Guam 17 ¶ 22 (quoting *Craig*, 497 U.S. at 850).

[20]     The U.S. Supreme Court's decision in *Craig* dealt with the testimony of a child complaining witness in a sexual abuse case, given via a one-way closed-circuit television system where the witness could not see or hear the defendant. *Craig*, 497 U.S. at 840-42. *Craig* established a two-prong test to determine when face-to-face confrontation with a child victim of alleged sexual abuse may be excused and one-way, closed-circuit television testimony used in its place: the government must prove: (1) that the "denial of [face-to-face] confrontation is necessary to further an important public policy," and (2) that "the reliability of the testimony is otherwise

---

[4] However, *Crawford* was discussed more fully at oral argument.

assured." *Id.* at 850.  The court emphasized that "[t]he requisite finding of necessity must of course be a case-specific one," and that, as such, "[t]he trial court must hear evidence" before determining whether the standard is met.  *Id.* at 855.  The Court identified four factors to determine reliability under the second prong of this test: (1) physical presence, (2) whether the testimony was taken under oath, (3) whether the accused had an opportunity to cross-examine, and (4) whether the jury could observe the witness's demeanor.  *Id.* at 845-46.  The Court held that the first prong of the test was satisfied because protecting minor victims of sex crimes was a compelling state interest.  *Id.* at 838.  The Court also concluded that three of the four reliability factors—all but physical presence—supported finding the one-way video setup reliable and therefore constitutional.  *Id.* at 857.

[21]    Despite the increase in remote testimony during the COVID-19 pandemic, *Craig* was the last time the Supreme Court examined the constitutionality of remote video testimony.  *E.g.*, *Bragg v. State*, 390 So. 3d 578, 583 (Ala. Crim. App. 2023) ("Since deciding *Craig*, the Supreme Court has not further examined the constitutionality of remote video testimony or considered new types of technology available to facilitate remote testimony . . . ." (quoting *Rogerson*, 855 N.W.2d at 499-500)), *cert. denied sub nom. Ex parte Bragg*, 390 So. 3d 594 (Ala. 2023).  At least one sitting Supreme Court Justice has expressed doubts about *Craig*'s application to two-way video:

> This case presents the question whether petitioner's rights under the Confrontation Clause of the Sixth Amendment, as applied to the States through the Fourteenth Amendment, were violated when the State introduced testimony at his trial via a two-way video that enabled the testifying witness to see and respond to those in the courtroom, and vice versa.  The question is an important one, and it is not obviously answered by *Maryland v. Craig* . . . .

*Wrotten v. New York*, 560 U.S. 959 (2010) (Sotomayor, J., respecting denial of certiorari).  But nevertheless, *Craig* remains "[t]he seminal Supreme Court case on the use of a video medium in lieu of physical confrontation . . . ."  *White v. State*, 116 A.3d 520, 542 (Md. Ct. Spec. App. 2015).

**[22]** Upon initial review, the trial court's decision seems to be a straightforward application of *Craig* to the facts here. However, further consideration reveals two non-trivial threshold issues. First, many courts have expressed sincere doubt that *Craig* remains good law. Second, even if *Craig* has not been overruled, it is not obvious that it should apply to two-way video because that case arose in the context of one-way video testimony of a child victim.

### 1. *Craig* remains good law until explicitly overruled by the U.S. Supreme Court

**[23]** *Craig* was a 5-4 decision where Justice Scalia wrote a blistering dissent: "Seldom has this Court failed so conspicuously to sustain a categorical guarantee of the Constitution against the tide of prevailing current opinion." *Craig*, 497 U.S. at 860 (Scalia, J., dissenting). The dissent states that "the Confrontation Clause does not guarantee reliable evidence; it guarantees specific trial procedures that were thought to *assure* reliable evidence, undeniably among which was 'face-to-face' confrontation." *Id.* at 862. Justice Scalia was sharply critical of the majority's approach:

> According to the Court, "we cannot say that [face-to-face] confrontation [with witnesses appearing at trial] is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." That is rather like saying "we cannot say that being tried before a jury is an indispensable element of the Sixth Amendment's guarantee of the right to jury trial." The Court makes the impossible plausible by recharacterizing the Confrontation Clause, so that confrontation (redesignated "face-to-face confrontation") becomes only one of many "elements of confrontation." The reasoning is as follows: The Confrontation Clause guarantees not only what it explicitly provides for—"face-to-face" confrontation—but also implied and collateral rights such as cross-examination, oath, and observation of demeanor (TRUE); the purpose of this entire cluster of rights is to ensure the reliability of evidence (TRUE); the Maryland procedure preserves the implied and collateral rights (TRUE), which adequately ensure the reliability of evidence (perhaps TRUE); therefore the Confrontation Clause is not violated by denying what it explicitly provides for—"face-to-face" confrontation (unquestionably FALSE). This reasoning abstracts from the right to its purposes, and then eliminates the right. . . . Whatever else it may mean in addition, the defendant's constitutional right "to be confronted with the witnesses against him" means, always and everywhere, at least what it explicitly says: the "'right to meet face to face all those who appear and give evidence at trial.'"

*Id.* at 862 (alterations in original) (citations omitted). Justice Scalia wrote that "[w]e are not free to conduct a cost-benefit analysis of clear and explicit constitutional guarantees, and then to adjust their meaning to comport with our findings." *Id.* at 870. He characterized the majority as supporting their "antitextual conclusion by cobbling together scraps of dicta from various cases that have no bearing here," specifically taking aim at the majority's reliance on *Ohio v. Roberts*, 448 U.S. 56 (1980). *Id.* at 863. Justice Scalia wrote that "*Roberts* . . . dealt with the *implications* of the Confrontation Clause, and not its literal, unavoidable text. . . . [T]hat the defendant should be confronted by the witnesses who appear at trial is not a preference 'reflected' by the Confrontation Clause; it is a constitutional right unqualifiedly guaranteed." *Id.* The dissent concluded that "[t]he Court has convincingly proved that the Maryland procedure serves a valid interest, and gives the defendant virtually everything the Confrontation Clause guarantees (everything, that is, except confrontation). I am persuaded, therefore, that the Maryland procedure is virtually constitutional. Since it is not, however, actually constitutional I would affirm the judgment of the Maryland Court of Appeals reversing the judgment of conviction." *Id.* at 870.

[24]     Fourteen years later, in *Crawford v. Washington*, Justice Scalia wrote for a majority of the Court overruling *Roberts*:

> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Crawford*, 541 U.S. at 61. *Crawford* abandoned the balancing test that had allowed statements which had "adequate indicia of reliability," *id.* at 42, and established a categorical rule that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination," *id.* at 68. In other words, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands

is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. More than one court has concluded that "[Justice Scalia's] dissent from *Craig* became the Supreme Court's view of the Confrontation Clause doctrine." *E.g.*, *State v. Smith*, 636 S.W.3d 576, 585 (Mo. 2022) (en banc); *see also People v. Jemison*, 952 N.W.2d 394, 398 (Mich. 2020) ("[Justice Scalia's] dissent from *Craig* became the Court's view, transforming its approach to the Confrontation Clause."). Thus, the reliability prong of the *Craig* test has been questioned by *Crawford*'s rejection of reliability as a measure of whether the Sixth Amendment is violated. *See, e.g.*, *Stevenson v. State*, 2021-KA-00411-COA (¶ 30 n.9), 357 So. 3d 1141 (Miss. Ct. App. 2023).

[25]     Except for the Second Circuit,[5] the Circuit Courts of Appeals generally express the opinion—often begrudgingly—that they are bound to treat *Craig* as good law until instructed otherwise. *See United States v. Maynard*, 90 F.4th 706, 711 (4th Cir. 2024) ("Still, because *Crawford* didn't overrule *Craig*, we're bound to treat it as good law."); *United States v. Cox*, 871 F.3d 479, 492 (6th Cir. 2017) (Sutton, J., concurring) (observing "the two opinions would give Janus a run for his money" and highlighting six specific points of tension between *Craig* and *Crawford*). By our count, the courts of at least 29 states have considered the interplay between *Craig* and *Crawford*.[6]     Alabama alone seems prepared to declare that *Crawford* implicitly

---

[5] As discussed below, the Second Circuit has held that the *Craig* standard does not apply to two-way video. *See United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (holding that a witness could testify by two-way video—without offending a defendant's confrontation right—"[u]pon a finding of exceptional circumstances . . . when [video testimony] furthers the interest of justice."). Although the Sixth Circuit has not taken a position in a published case, it followed the *Gigante* decision in an unpublished decision. *See United States v. Benson*, 79 F. App'x 813, 821 (6th Cir. 2003).

[6] *See Ex parte Bragg*, 390 So. 3d 594, 595 (Ala. 2023) (mem.); *People v. Gonzales*, 281 P.3d 834, 863 (Cal. 2012); *People v. Phillips*, 2012 COA 176, ¶ 53; *State v. Arroyo*, 935 A.2d 975, 991 n.18 (Conn. 2007); *Blanton v. State*, 978 So. 2d 149, 158 (Fla. 2008); *In re E. T.*, 804 S.E.2d 725, 731 n.7 (Ga. Ct. App. 2017); *People v. Franklin*, 2023 IL App (1st) 200996, ¶ 82, *appeal denied*, 221 N.E.3d 390 (Ill. 2023), *cert. denied*, 144 S. Ct. 852 (2024) (mem.); *State v. White*, 9 N.W.3d 1, 11 (Iowa 2024); *State v. Blanchette*, 134 P.3d 19, 29 (Kan. Ct. App. 2006); *Campbell v. Commonwealth*, 671 S.W.3d 153, 166 (Ky. 2023); *White v. State*, 116 A.3d 520, 542 n.31 (Md. Ct. Spec. App. 2015); *People v. Jemison*, 952 N.W.2d 394, 396 (Mich. 2020); *State v. Trifiletti*, 6 N.W.3d 79, 90-91 (Minn. 2024); *Stevenson v. State*, 2021-KA-00411-COA (¶ 30 n.9), 357 So. 3d 1141 (Miss. Ct. App. 2023); *State v. Smith*, 636 S.W.3d 576, 587 (Mo. 2022) (en banc); *State v. Mercier*, 2021 MT 12, ¶ 25, 403 Mont. 34, 479 P.3d 967; *State v. C.D.*, No. A-

overruled *Craig*. *Ex parte Bragg*, 390 So. 3d at 595 (Parker, C.J., concurring) ("I believe that the balancing approach of *Maryland v. Craig* . . . has been effectively overruled by the textual-historical approach established in *Crawford v. Washington* . . . ." (citations omitted)). At least two more state courts have held that *Craig* should be limited to its specific facts. *See, e.g.*, *Smith*, 636 S.W.3d at 587; *Jemison*, 952 N.W.2d at 396. Despite these decisions and the fact that "[t]here is no doubt that the role of reliability in a Confrontation Clause analysis has been called into question," *Haggard v. State*, 612 S.W.3d 318, 326-27 (Tex. Crim. App. 2020), "nearly all courts and commentators have agreed, *Crawford* did not overrule *Craig*," *Roadcap v. Commonwealth*, 653 S.E.2d 620, 625 (Va. Ct. App. 2007) (footnote omitted); *accord People v. Franklin*, 2023 IL App (1st) 200996, ¶ 82 ("[W]hile continuing to rely on *Craig* in the era of *Crawford* 'may be problematic,' *Craig* nonetheless remains good law in this jurisdiction and 'we are bound to follow it.'" (quoting *People v. Pope*, 2020 IL App (4th) 180773, ¶¶ 44, 46)); *State v. Mercier*, 2021 MT 12, ¶ 25, 403 Mont. 34, 479 P.3d 967 ("[W]e are not prepared to declare the proverbial death knell to *Craig* just yet, and prefer to await further direction from the Supreme Court. As one commentator has noted, it may be that the two cases may coexist, with *Crawford* setting the standard for the type of out-of-court statements that are subject to the confrontation right and *Craig* governing the manner in which in-court testimony may be presented.").

---

0055-12T2, 2014 WL 10212770, at *12 (N.J. Super. Ct. App. Div. Aug. 12, 2015) (per curiam); *State v. Thomas*, 2016-NMSC-024, ¶ 26, 376 P.3d 184; *In re Noel O.*, 855 N.Y.S.2d 318, 324 n.5 (Fam. Ct. 2008); *State v. Seelig*, 738 S.E.2d 427, 434 (N.C. Ct. App. 2013); *State v. Carter*, 174 Ohio St. 3d 619, 2024-Ohio-1247, 238 N.E.3d 87, at ¶¶ 27-31, 35; *Commonwealth v. Tighe*, 184 A.3d 560, 569 (Pa. Super. Ct. 2018), *aff'd but criticized*, 224 A.3d 1268 (Pa. 2020); *State v. Bowers*, No. M2022-00949-CCA-R3-CD, 2023 WL 6211909, at *13 (Tenn. Crim. App. Sept. 25, 2023) (McMullen, P.J., concurring in part and dissenting in part); *Haggard v. State*, 612 S.W.3d 318, 326-27 (Tex. Crim. App. 2020); *State v. Henriod*, 2006 UT 11, ¶ 16, 131 P.3d 232; *Roadcap v. Commonwealth*, 653 S.E.2d 620, 625 (Va. Ct. App. 2007); *State v. D.K.*, 507 P.3d 859, 862 (Wash. Ct. App. 2022); *State v. Herbert*, 767 S.E.2d 471, 501 n.12 (W. Va. 2014) (Loughry, J., concurring in part and dissenting in part); *State v. Vogelsberg*, 2006 WI App 228, ¶ 16, 297 Wis. 2d 519, 724 N.W.2d 649.

**[26]** As one treatise has noted, the pandemic forced nearly all courts to grapple with remote testimony, and the majority of jurisdictions relied on *Craig*:

> The 2020 pandemic created significant challenges for courts adjudicating criminal cases. One of those challenges was preserving the rights of criminal defendants under the Confrontation Clause when conditions made it dangerous for witnesses, defendants, and counsel to be together in the courtroom. Many pre-pandemic courts had allowed witnesses to testify via two-way video conferencing—even at trial itself and even without the consent of the defendant—when the witness was unable to travel to testify live. They allowed this only after applying the two prong analysis of *Craig*, which allowed video testimony only when (1) the witnesses' absence is "necessary to further an important public policy and (2) the reliability of the testimony is otherwise assured." Courts during the pandemic continued to apply the *Craig* test to authorize remote testimony by witnesses in trial and other proceedings that carried the right to confrontation. Reviewing courts rejected video testimony, however, when trial courts failed to consider, or erroneously rejected, viable alternative steps that could have preserved in-person testimony while safeguarding health and safety.

Wayne R. LaFave et al., 6 *Crim. Proc.* § 24.2(e) (4th ed. Nov. 2024 Update) (footnotes omitted); *cf.* Wayne R. LaFave et al., 6 *Crim. Proc.* § 24.4(b) (5th ed. Nov. 2025 Update) ("Since the pandemic, the number of states permitting and considering remote testimony in criminal proceedings has increased."). We agree with the People that "[a] per se prohibition on remote testimony in any other case is inconsistent with the developing law in the rest of the country," and "[c]ourts across the country have adopted the two-prong standard in *Maryland v. Craig* to determine whether testimony via two-way closed-circuit telecommunication is constitutionally permissible." Appellee's Br. at 2, 12. We join the majority of jurisdictions in finding that *Craig* remains good law.

### 2. *Craig*'s framework is appropriate for two-way video testimony of an adult

**[27]** Even if *Craig* remains good law, it does not by its own terms apply to two-way video testimony of an adult witness. Camacho correctly points out that *Craig* dealt with the testimony of a child victim delivered via one-way video. *See* Appellant's Br. at 8. However, his argument that remote testimony is only allowed at trial for a child witness under Guam Rule of Evidence

804.1(d) is misguided, *see id.* at 9-11, as exemplified by the many cases which have allowed testimony of adult witnesses via two-way video absent any evidentiary rule, *e.g.*, *People v. Lujan*, 150 Cal. Rptr. 3d 727, 729, 733-34 (Ct. App. 2012) (holding California courts have inherent authority to order remote testimony); *People v. Wrotten*, 923 N.E.2d 1099, 1101 (N.Y. 2009).

[28]     Camacho's argument that "the Government would like to create an exception that swallows the rule," Appellant's Reply Br. at 3 (May 9, 2025), is unfounded and unsupported by authority. His argument misapprehends the relationship between the Constitution, court rules, and legislation. *See id.* at 3-4. Camacho's reasoning is circular: the presence of a rule does not make that rule constitutional. *See, e.g.*, *United States v. Gear*, Cr. No. 17-00742 SOM-1, 2019 WL 150538, at *3 (D. Haw. Jan. 9, 2019) ("The Government appears to be arguing that the very existence of Rule 15(c)(3) satisfies the 'important public policy' requirement. This court is unaware of any authority for that proposition."). The People are correct that including a "procedure for remote testimony of child witnesses in GRE 804.1" but not for other forms of remote testimony is not determinative. *See* Appellee's Br. at 9-10.

[29]     *Craig* arose under a Maryland law that allowed child witnesses in sex abuse cases to testify via one-way video; *Craig*'s applicability here is therefore uncertain. Camacho argues that the decisions of this court have set "a high bar . . . to overcome the Defendant's Right to face-to-face confrontation. The standards should not be lower[] than that set by Rule 804.1 and *Craig*." Appellant's Br. at 11. The People disagree, arguing that this court's precedent "can be extended to cases other than child victims of sexual assault provided that the important interest advanced by the People is specific to the case at bar." Appellee's Br. at 9. The People are correct that "[p]rotecting child victims of sexual abuse . . . is by no means the only important interest that may outweigh a defendant's right to face-to-face confrontation." *See id.* at 10.

[30]     Generally, other jurisdictions deciding whether adult-witness testimony via two-way live video satisfies the Confrontation Clause follow one of three approaches: (1) the Second Circuit's test in *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999), (2) *Crawford*, or (3) *Craig*. *See Smith*, 636 S.W.3d at 582-84 (discussing three main approaches and collecting cases). Even before *Crawford*, some courts held that the *Craig* standard did not apply to two-way video testimony. We review these approaches below.

### a.  Although pragmatic, *Gigante* is an outlier that provides less protection

[31]     Most notable of the decisions finding *Craig* inapplicable to two-way video is the Second Circuit's decision in *Gigante*. Camacho's analysis of *Gigante* is unconsidered, and despite his conclusory statement to the contrary, application of the *Gigante* standard undermines his arguments on appeal. *See* Appellant's Br. at 13-15.

[32]     In *Gigante*, the Second Circuit held that because the trial court "employed a two-way system that preserved the face-to-face confrontation celebrated by *Coy*, it is not necessary to enforce the *Craig* standard in this case." *Gigante*, 166 F.3d at 81. Instead, the court applied the standard from Federal Rule of Criminal Procedure 15 governing depositions, which requires (1) a finding of exceptional circumstances and (2) that the testimony would further the interests of justice. *Id.* The Second Circuit reasoned that "two-way closed-circuit television testimony does not necessarily violate the Sixth Amendment. Because this procedure may provide at least as great protection of confrontation rights as Rule 15, we decline to adopt a stricter standard for its use than the standard articulated by Rule 15." *Id.* The Second Circuit emphasized its belief that remote testimony would afford "greater protection" of a defendant's "confrontation rights than would have been provided by a Rule 15 deposition." *Id.* To support its conclusion that remote testimony was superior to a deposition, the court pointed to the fact it forced the witness to testify before the jury, allowed the jury to judge the witness's credibility "through his demeanor and comportment,"

and allowed the defendant's attorney to weigh the impact of the witness's "direct testimony on the jury as he crafted a cross-examination." *Id.* The court contrasted this with Rule 15 practice, where "the bare transcript" of the witness's deposition would have been admitted, "which would have precluded any visual assessment of his demeanor." *Id.* The Second Circuit emphasized that "[c]losed-circuit television should not be considered a commonplace substitute for in-court testimony by a witness." *Id.*

[33]    The Second Circuit stands as an extreme outlier in holding that a "confrontation" via two-way video is equivalent to a face-to-face confrontation. *See United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005) (rejecting view that two-way video is constitutionally equivalent to face-to-face confrontation); *see also* 6 *Crim. Proc.* § 24.4(b) (5th ed.) ("Not surprisingly, no other circuit has accepted the *Gigante* approach, either in dispensing with the *Craig* requirements for two-way videoconferencing, or in using Rule 15 as a substitute for *Craig*."). And most states have also rejected *Gigante*'s view of confrontation. *See, e.g.*, *State v. Tate*, 969 N.W.2d 378, 385 (Minn. Ct. App. 2022) (terming *Gigante* the "primary outlier"). However, more recently, some jurists have expressed their increased receptiveness to *Gigante* given their experiences with remote testimony during the pandemic:

> Rather than purposefully obscuring a fundamental aspect of live testimony, the modern two-way telecommunications technology at issue here is intended to transmit substantially the same information as that shared by individuals physically present in the same room. As the COVID-19 pandemic has forced many of us to discover, such technology can now readily host a wide range of important interactions, including court proceedings such as the oral argument in this appeal. . . . Mechanical application of the *Craig* standard is unhelpful in this dynamic technological context.
>
> The *Duane* standard allows a court to effectively vindicate constitutional rights without falling into technological obsolescence.

*Mercier*, 2021 MT 12, ¶¶ 50-51 (McGrath, C.J., specially concurring); *see also id.* ¶ 45 (McGrath, C.J., specially concurring) (arguing Montana adopted *Gigante* in *City of Missoula v.*

*Duane*, 2015 MT 232, 380 Mont. 290, 355 P.3d 729). Although much of *Gigante*'s pragmatic approach is attractive, courts have been apprehensive about concluding that the standard for deposing a witness adequately safeguards a defendant's Sixth Amendment rights. *See, e.g.*, *Tate*, 969 N.W.2d at 385-86; *Rogerson*, 855 N.W.2d at 504. We share that apprehension.

### b. *Crawford* establishes a categorical rule that does not easily map onto incourt testimony

[34] While the Second Circuit has relied on Rule 15 to replace *Craig*, it is not the only court to find *Craig* does not apply to two-way video. As referenced above, both Missouri and Michigan have limited *Craig* to its specific facts—testimony of a child witness via one-way video. Michigan seems to stand alone in explicitly applying *Crawford* to all witnesses who are not child victims. *See Jemison*, 952 N.W.2d at 400 ("The witness here was neither the victim nor a child; *Crawford* thus provides the applicable rule."). In *People v. Jemison*, 952 N.W.2d 394 (Mich. 2020), the Michigan Supreme Court stated that under *Crawford*, a "defendant's confrontation right is absolute for all 'testimonial' evidence unless a witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *Id.* at 399 (quoting *Crawford*, 541 U.S. at 68). The court reversed the defendant's conviction because the witness's testimony was "testimonial," and the defendant had a "right to face-to-face cross-examination" because the witness "was available, and the defendant did not have a prior chance to cross-examine him." *Id.* at 401.

[35] In *State v. Smith*, 636 S.W.3d 576 (Mo. 2022) (en banc), the Missouri Supreme Court explained that under *Crawford*, "a defendant's confrontation right is absolute for testimonial evidence unless the witness is unavailable and the defendant had 'a prior opportunity for cross-examination.'" *Smith*, 636 S.W.3d at 585 (quoting *Crawford*, 541 U.S. at 68). The court then reversed the defendant's conviction because the trial court failed to make an express finding that the witness who testified via two-way video was unavailable. *Id.* at 587. The *Smith* court stated

that although it need not decide "[w]hether the combination of oath, cross-examination, and observation of demeanor, when utilized in a two-way video setting in which the witness is in a remote location with minimal or no safeguards, is ever enough to ensure the reliability of any witness," it was "not confident the issue would be decided the same way today." *Id.* After quoting at length from Justice Sotomayor's order stating that the constitutionality of two-way video is "not obviously answered by *Maryland v. Craig*," the court concluded that "[t]o decide two-way video procedures categorically satisfy the safeguards of the Confrontation Clause would be to easily dispense with the 'face-to-face confrontation requirement,' something the Supreme Court required in *Crawford* . . . and even expressly cautioned against in *Craig* . . . ." *Id.* (quoting *Wrotten*, 560 U.S. 959 (Sotomayor, J., respecting denial of certiorari)). Thus, the Missouri Supreme Court appears inclined to apply *Crawford* to two-way testimony, but it has yet to explicitly do so.

[36]     Although the categorial rule of *Crawford* makes for easy application, the impracticality of its results may account for why most courts are reluctant to apply it in place of *Craig*. Most courts do not seem inclined to adopt a categorical bar on remote testimony unless the U.S. Supreme Court explicitly requires such a result. Because *Crawford* recognizes "only those exceptions [to confrontation] established at the time of the founding," 541 U.S. at 36, it forces courts to engage in awkward thought experiments by asking questions like "What did James Madison think of Zoom meetings?"[7] Although *Crawford* adopted much of the dissent from *Craig*, the focus of *Crawford* was not physical confrontation, but cross-examination. As Justice Scalia wrote in *Crawford*, the Confrontation Clause commands that reliability be assessed in a particular manner: "by testing in the crucible of cross-examination." 541 U.S. at 37. Because *Crawford* focuses on

---

[7] To paraphrase a famous quip from oral arguments before the U.S. Supreme Court: "Well, I think what Justice Scalia wants to know is what James Madison thought about video games." Tr. of Oral Arg. at 17, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) (No. 08-1448).

the prior opportunity for cross-examination, a rule requiring a remote deposition before remote testimony at trial would arguably satisfy the letter of the *Crawford* standard—even if the defendant is not physically present to confront the witness at either time. But such a rule violates the spirit of Justice Scalia's dissent in *Craig* (in addition to adding the extra inconvenience and cost of having to depose all videoconference witnesses before they can testify at trial). Although adopting *Crawford* would safeguard the Sixth Amendment rights of defendants, it would likely necessitate adopting prophylactic rules that would impose costs not necessarily required by the Constitution. We do not adopt *Crawford*, especially because Camacho does not ask us to do so.

### c. Although *Craig* is not without its problems, we adopt its standard

[37]    Except for the Second Circuit, every circuit that has addressed the testimony of an adult witness via two-way video in a published decision has applied *Craig*. The trial court relied on the Eleventh Circuit to support its conclusion that *Craig* applied. RA, tab 63 at 3 (Dec. & Order) (quoting *Yates*, 438 F.3d at 1315). The Eleventh Circuit standard on which the trial court relied also emphasizes the need for an evidentiary hearing, *id.*, which fits into this court's jurisprudence on remote testimony, *see Callahan*, 2018 Guam 17 ¶ 22 (holding evidentiary hearing mandatory under Guam Rule of Evidence 804.1 when requested).

[38]    Another leading decision adopting *Craig* for two-way video testimony is from the Ninth Circuit, *United States v. Carter*, 907 F.3d 1199, 1207-08 (9th Cir. 2018). There, the Ninth Circuit held "that a defendant's right to physically confront an adverse witness (whether child or adult) cannot be compromised by permitting the witness to testify by video (whether one-way or two-way) unless *Craig*'s standard is satisfied." *Id.* at 1206. However, *Carter* has a confounding bit of logic: forgoing physical confrontation for a two-way video procedure is not "necessary" when a deposition of the witness is theoretically possible with the defendant present. *See id.* at 1209.

*Carter* held that depositions are preferable to live remote testimony at trial.[8]  *United States v. Harris*, 842 F. App'x 28, 30 (9th Cir. 2020) (citing *Carter*, 907 F.3d at 1209).  The Eleventh Circuit's decision in *Yates* also focuses on the (theoretical) availability of a deposition.  *See* 438 F.3d at 1314.  In that case, the Eleventh Circuit determined that the *Craig* standard was not met because, despite the defendants being tried in Alabama, the government failed to show any special circumstances prevented it from taking the witnesses' testimony at depositions in Australia (which defendants were theoretically allowed to attend).[9]

[39]     A recent case out of Hawai'i shows how courts can interpret the *Craig* standard to require impractical results.  In *United States v. Harris*, the owner and operator of a Honolulu business was charged with multiple crimes for fraudulently billing a government health care program for speech therapy services provided to special-needs children of military families.  983 F.3d 1125, 1126 (9th Cir. 2020).  The government requested that two witnesses "be permitted to testify via two-way live video due to the exceptional circumstances of the severe illnesses of their minor children and the public policy present in this case involving military families with special needs children."  *United States v. Harris*, CR. No. 17-00001 HG-01, 2018 WL 1990519, at *4 (D. Haw. Apr. 26, 2018),

---

[8] Although *Carter* was decided only seven years ago, this pre-pandemic decision was decided before the current paradigm shift where the majority of depositions in civil cases are now conducted remotely, and remote depositions are gaining wider acceptance in criminal cases. *See* Wayne R. LaFave et al., 6 *Crim. Proc.* § 24.4(b) (5th ed. Nov. 2025 Update) ("Since the pandemic, the number of states permitting and considering remote testimony in criminal proceedings has increased."); *Examination of Witnesses* § 2:29 n.2 (2d ed. Oct. 2025 Update) (noting depositions in criminal cases are generally strongly disfavored on policy grounds, but "the use of video technology changes this dynamic and mitigates to some degree the absence of an opportunity to observe a witness's demeanor"); Lauren Angelina, Note, *Civil Courts in the Aftermath of A Global Pandemic: Enhancements or Disruptions?*, 31 Widener L. Rev. 45, 52 (2025) ("[S]urveys show that over eighty percent of attorneys anticipate 'at least one party in every proceeding going forward to participate remotely.'" (footnote omitted)).

[9] The Eleventh Circuit's discussion of taking depositions in a foreign country on the other side of the world was rather superficial. *See* Matthew J. Tokson, Comments, *Virtual Confrontation: Is Videoconference Testimony by an Unavailable Witness Constitutional?*, 74 U. Chi. L. Rev. 1581, 1614 n.159 (2007) ("Whether or not depositions taken in Australia, at issue in *Yates*, would meet this standard is unclear.  It appears possible, though it largely depends on local immunity and privilege law and the willingness of Australian officials to accommodate requests for full cross-examination and videotaping.  *Yates* ignores the issue.").  The 2012 amendments to the Federal Rules of Criminal Procedure acknowledge that there are instances where a defendant cannot be transported to a witness's location for a deposition. *See* Fed. R. Crim. P. 15 advisory committee's note to 2012 amendment.

*aff'd*, 842 F. App'x 28 (9th Cir. 2020). One witness lived in North Carolina, had a minor child with special needs, and had a husband deployed on active duty; while the other witness had to give round-the-clock care to her daughter who was in a serious accident. *Id.*, at *4-5. The district court granted the government's request to allow the witnesses to testify by two-way video, reasoning that "[l]ive video conferencing is preferable to deposition testimony." *Id.*, at *3 (citing *Gigante*, 166 F.3d at 81). In a memorandum decision filed concurrently with the published opinion on appeal, the Ninth Circuit found that district court's decision was error because "[o]ur court in *Carter*, however, held the opposite with respect to the preferability of depositions." *Harris*, 842 F. App'x at 30-31. The Ninth Circuit reasoned that "[t]he record does not reflect . . . that the witnesses were unavailable for depositions near their respective homes. . . . Because this alternative was available to preserve Harris's right to physical face-to-face confrontation, two-way video testimony was not 'necessary,' and thus Harris's confrontation rights were violated under *Carter*." *Id.*

[40]     Although the Ninth Circuit ultimately found this error was harmless, it did not seem to have considered the practical realities of their decision—including that a deposition would have satisfied Harris's confrontation rights only if she was transported over 4,500 miles from Hawai'i to North Carolina (while presumably in federal custody). *See id.* at 30 ("The record does not reflect, however, that the witnesses were unavailable for depositions near their respective homes."). Whatever shortcomings the Second Circuit's *Gigante* decision might have, its conclusion seems much more reasonable that "closed-circuit presentation of [witness] testimony afforded greater protection of [the defendant's] confrontation rights than would have been provided by a Rule 15 deposition." *Gigante*, 166 F.3d at 81. As a leading treatise notes:

> In a number of cases, . . . a prosecutor has urged a court to allow a witness to testify by closed-circuit TV from a remote location, *without* giving the defendant the right to be present. The government has argued, with some plausibility, that

allowing the witness to testify live, by *two-way* closed-circuit television, where the witness can see what is happening in the courtroom just as those in the courtroom can watch the witness is, in fact, better than a Rule 15 deposition, because it permits the jury to see and hear the witness testify, and thereby gives the jury a far better opportunity to evaluate and weigh the witness' testimony than it could if it received only a written transcript of that testimony.

4 Clifford S. Fishman & Anne T. McKenna, *Jones on Evidence* § 25A:59 (7th ed. Nov. 2025 Update). These arguments typically fail under the *Craig* standard. *Id.* ("The message seems clear: whether one camera, two, or none are employed, a deposition per Rule 15, with actual in-the-same-room confrontation remains the constitutional standard, even if the government must go to considerable expense and inconvenience.").

[41]     The *Harris* decision illustrates that for jurisdictions like Guam and Hawai'i, the *Craig* standard can be interpreted in problematic ways, insofar as some courts hold *Craig* establishes a categorical preference for depositions with in-the-same-room confrontation. *See Harris*, 842 F. App'x at 30. Contrast this with *Gigante*, where the Second Circuit considered the defendant's "own inability to participate in a distant deposition," when it found remote testimony preferable. *See* 166 F.3d at 81. When traveling thousands of miles makes it difficult for a witness to attend a trial in person, the converse will also likely be true, and it will usually be difficult for a defendant to attend a deposition in person. One can empathize with the district court in *Harris*, ruling before *Carter* was decided, when it justified its decision that remote testimony was superior to a deposition with the observation that "[a] close reading of *Crawford* reveals that the opportunity for rigorous cross-examination, rather than mere physical presence of the defendant, is the central tenet of the confrontation right." *Harris*, 2018 WL 1990519, at *4 (alteration in original) (quoting *United States v. Rosenau*, 870 F. Supp. 2d 1109, 1115 (W.D. Wash. 2012)); *accord* Alisson Sandoval, *"It's the End of the World As We Know It" – Redrafting Amendment to Federal Rule of*

*Criminal Procedure 26 to Allow Remote Testimony*, 39 Touro L. Rev. 605, 631 (2024) ("[T]here are several reasons why Rule 15 depositions are inferior to two-way video testimony.").

[42]     Here, the Superior Court reached a similar conclusion as the district court in *Harris*, determining that remote testimony was preferable to a deposition. The trial court found that:

> The only proposed alternative from the People or Defendant would involve flying the Defendant, his counsel, and any other necessary parties to Ohio to attend a deposition of Dr. Nine there. This would erase the opportunity for the jury to scrutinize the witness during his testimony, and would arguably provide a less fair trial for the Defendant. Allowing Dr. Nine to testify remotely would also avoid the significant time and financial costs of a deposition in Ohio. Furthermore, any evidence or hearsay objections that may arise during a deposition would not be reviewable by the Court in the moment they are made in the circumstance of a deposition. Live, remote testimony would allow for the Court to rule instantly on any objections, just as it would if the witness were in person.
>
>      . . . . The Court believes that two-way, remote video testimony will allow for the Defendant's trial to take place at the earliest possible time, without the significant delays that would be associated with a deposition taking place in Ohio.

RA, tab 63 at 6 (Dec. & Order). Although this conclusion runs afoul of the Ninth Circuit's reasoning in *Carter* and *Harris*, we endorse the trial court's case-specific conclusion that live video conferencing was preferable to deposition testimony. We agree that "courts can make case-specific findings that video testimony is required to further important public policies even where . . . depositions are legally available." *See* Matthew J. Tokson, Comments, *Virtual Confrontation: Is Videoconference Testimony by an Unavailable Witness Constitutional?*, 74 U. Chi. L. Rev. 1581, 1608 (2007). Unlike the Eleventh and Ninth Circuits, we reject a deposition requirement. The Supreme Court's decision in *Craig* said nothing about depositions. We are not bound to adopt an interpretation of *Craig* that the theoretical possibility of a deposition renders remote testimony categorically unnecessary.

[43]     We have cited *Craig* twice, both in the context of child testimony. *See Morales*, 2022 Guam 1 ¶ 20; *Callahan*, 2018 Guam 17 ¶ 29. In distinguishing the application of *Craig* in

*Callahan*, we observed that "[w]e are not confronted with the use of digital video conferencing programs or other methods that might strike the same balance as *Craig*'s closed-circuit television." *Callahan*, 2018 Guam 17 ¶ 30. This issue is now before the court, and we find that two-way video conferencing strikes the same balance as the one-way close-circuit video in *Craig*. We join the majority of state courts in finding *Craig* applies to testimony from an adult witness via two-way video, with the caveat that the theoretical possibility of a deposition does not render remote testimony unnecessary.

## B. The Trial Court applied *Craig* Correctly

[44]     Having determined that *Craig* applies, the next question is whether the People met their burden under that standard and whether the trial court made case-specific findings on that point. To satisfy *Craig*, the trial court must make a case-specific finding after an evidentiary hearing that: (1) denial of in-person, face-to-face confrontation is necessary to further an important public policy; and (2) the reliability of the videoconference testimony can and will be procedurally assured. *See Craig*, 497 U.S. at 850, 855; *State v. Hamed*, 21-167, p. 6 (La. App. 5 Cir. 8/18/21), 326 So. 3d 375, 381. The People bear the burden of making a "case-specific" showing that both prongs of *Craig* are met by a preponderance of evidence. *Hamed*, 326 So. 3d at 381.

[45]     The People argue, "The trial court addressed both prongs of the *Craig* test and applied them to the facts of this case. Accordingly, it did not err in determining that Dr. Nine should be allowed to testify remotely, outside of Mr. Camacho's physical presence." Appellee's Br. at 12. We agree.

### 1. The People have shown that denial of in-person, face-to-face cross-examination is "necessary to further an important public policy"

[46]     Camacho claims that "[i]n this case, there simply is no necessity of the type *Craig* contemplates." Appellant's Br. at 13 (emphasis omitted). He claims that "[t]he decision and order of the trial court does not spell out the public policy interest which outweighs the face-to-face

confrontation rights of Defendant-Appellant Camacho required by *Craig*." *Id.* at 15. It is incorrect to claim the trial court made no findings on this prong of *Craig*, as the trial court identified at least three public policy concerns it felt rendered the remote testimony necessary. RA, tab 63 at 4-6 (Dec. & Order). Although it is a close call whether these public policies—in isolation or combination—satisfy *Craig*, Camacho's attempt to dismiss them is unpersuasive. The People are correct that "the trial court was guided by the proper standard set out in *Maryland v. Craig* and re-articulated in *United States v. Yates*" and made the requisite case-specific findings.[10] Appellee's Br. at 10.

[47] "[A] defendant's right to 'physical, face-to-face confrontation at trial' may be compromised by the use of a remote video procedure only upon a 'case-specific finding' that [] the denial of physical confrontation 'is necessary to further an important public policy[.]'" *Mercier*, 2021 MT 12, ¶ 19 (alterations in original) (quoting *Carter*, 907 F.3d at 1208). "Under the first prong, we consider de novo whether the use of live, remote, two-way video technology for the [prosecution witness's] testimony [i]s necessary to further an important public policy." *Tate*, 969 N.W.2d at 386. "Courts are essentially uniform in requiring, under the first prong, 'something more than [] generalized findings' of policy concerns." *Mercier*, 2021 MT 12, ¶ 19 (alteration in original) (quoting *Coy*, 487 U.S. at 1021). The Montana Supreme Court has held that "'judicial economy, added expense, or inconvenience alone are not important public policies sufficient to preclude the constitutional right of a defendant to face-to-face confrontation at trial,'

---

[10] The People are incorrect that Dr. Nine is beyond the Superior Court's subpoena power. *See* Appellee's Br. at 11 (May 7, 2025). Both Guam and Ohio have adopted the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. 8 GCA § 164.30 (added by Guam Pub. L. 37-110:1 (July 22, 2024)); Ohio Rev. Code Ann. § 2939.26 (West 2025); *see also* Appellant's Reply Br. at 5-6 (May 9, 2025). This may cast some doubt on whether Dr. Nine would be unavailable under *Crawford*, which generally requires a good faith effort to subpoena the witness. *See, e.g.*, *State v. Trice*, 874 N.W.2d 286, 295 (Neb. 2016) ("While issuance of a subpoena is not an absolute prerequisite to proving a witness is unavailable, serving a witness with a subpoena to testify ordinarily constitutes a sufficient good faith effort to procure the witness' attendance at trial." (footnotes omitted)).

although they may be a part of the consideration of the circumstances.'" *State v. Whitaker*, 2024 MT 255, ¶ 22, 418 Mont. 501, 558 P.3d 741 (citations omitted). "Courts define an 'important public policy' narrowly for the purpose of finding an exception to the Confrontation Clause." *Tate*, 969 N.W.2d at 386.

[48]     Although this prong is reviewed *de novo*, the trial court's findings are a proper place to begin this court's analysis—if for no other reason than to determine whether the court made the "case-specific" determination required by *Craig*. *See Craig*, 497 U.S. at 855. The trial court identified three public policies that supported remote testimony: (1) the caretaking responsibilities of Dr. Nine and his family's health; (2) Dr. Nine's unique testimony about the autopsy he performed; and (3) the mandate of 8 GCA § 80.50 that "all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time." RA, tab 63 at 4-6 (Dec. & Order). The trial court found the California Court of Appeal's decision in *People v. Coulthard*, 307 Cal. Rptr. 3d 383 (Ct. App. 2023), to be persuasive. *Id.* at 5-6 (Dec. & Order).

[49]     The trial court's findings are case-specific rather than "'generalized findings' of policy concerns." *See Mercier*, 2021 MT 12, ¶ 19. Camacho is incorrect in his claim that the trial court did not "spell out" the public policy interests. *See* Appellant's Br. at 15. However, the trial court's reliance on *Coulthard* was somewhat misplaced. The California court mentioned several of the policy concerns that exist in this case:

> [Witness] was the primary caretaker of two of her children (both of whom were too young to be vaccinated against COVID-19) and did not have the means to arrange for alternate childcare. Further, [witness]'s testimony could not be supplanted with testimony from some other person, and [defendant] had asserted his right to a speedy trial. As such, there was no reasonable alternative to [witness]'s remote testimony at the time the trial court ruled.

*Coulthard*, 307 Cal. Rptr. 3d at 411. The court's decision was rooted in public policy concerns related to the COVID-19 pandemic—including the travel of an unvaccinated witness from the UK

to California. *Id.* (quoting *Hernandez-Valenzuela v. Superior Court*, 291 Cal. Rptr. 3d 154, 169 (Ct. App. 2022); *People v. Kocontes*, 302 Cal. Rptr. 3d 664, 737 (Ct. App. 2022); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam)). When considered in combination, we conclude the public policies here are important enough to satisfy *Craig*.

### a. Caretaking of family members is usually insufficient to satisfy *Craig* on its own, but suffices under the unique facts of this case

[50]     The trial court found that "ensuring the safety of Dr. Nine's wife and child qualifies as an important public policy, particularly given the large distance between Guam and Ohio and the unique circumstances requiring his physical presence." RA, tab 63 at 5-6 (Dec. & Order). Standing alone, caretaking of family members is usually insufficient to satisfy *Craig*. For example, the Wyoming Supreme Court held that while it was appropriate for a witness who could not travel because of a serious medical condition to testify remotely, it was error to allow his wife (who had no illness) to do the same. *Bush v. State*, 2008 WY 108, ¶ 54, 193 P.3d 203, 216 (Wyo. 2008) ("We have found no cases in which any court has considered whether circumstances such as these were sufficient to show testimony by video conference was necessary to further an important public policy."). The Ninth Circuit also rejected similar caretaking concerns in *Harris*. *Harris*, 842 F. App'x at 30-31. The Washington Court of Appeals seems to be the only court that has recognized that "the important policy of alleviating physical pain and suffering can extend to the circumstances when the witness would attend to another's needs resulting from such suffering." *State v. Sweidan*, 461 P.3d 378, 389 (Wash. Ct. App. 2020). There is some persuasive value to their holding that "[n]o reason exists to distinguish between the aching of the witness and the hurting of a witness's close family member." *Id.*

[51]     Rather than attempting to address this unsettled question on the merits, Camacho suggests that "[w]hile the health of family members of the witness are genuine private concerns, they are

not important public policy concerns that overcomes the Confrontation Clause." *See* Appellant's Br. at 16. Camacho argues that "[t]he record does not establish that the health of family members would be endangered, in fact, [Dr. Nine] admitted that he has flown to Guam three times between May and October of 2024. He also acknowledged that his wife is the daily caregiver for their foster child and that his medical condition is static." *Id.* Because we review this issue *de novo*, we need not defer to the trial court's conclusion that the health of Dr. Nine's family prevents him from traveling to Guam without putting their lives at risk. *See* RA, tab 63 at 5-6 (Dec. & Order).

[52]     We conclude the unique facts on the record before us render this an exceptional case. Dr. Nine is a licensed medical professional providing care to his wife and son, providing an important distinction in this case from those in other jurisdictions where courts rejected caretaking of family members as important public policies under *Craig*. *See Bush*, 2008 WY 108, ¶ 54; *Harris*, 842 F. App'x at 30-31. The conditions of Dr. Nine's family members are serious, and in the case of his son is life-threatening. Dr. Nine testified that his wife's condition impairs her vision, and her medication—which he administers—renders her "severely immunodepressed and immunocompromised." Tr. at 7 (Mot. Hr'g). He testified that because of her condition, "she does not drive a vehicle" and rarely leaves their home. *See id.* at 7-8. Dr. Nine further testified that their son "requires 24-hour care because of his quadriplegia and severe cerebral palsy." *Id.* at 9. Also, his son "requires three therapy sessions every week." *Id.* Dr. Nine testified that although his wife has the medical training to care for their son, she cares for him only while Dr. Nine is at work, and he "take[s] care of him the rest of the time." *Id.* at 15. According to Dr. Nine, he has no family or close friends in Ohio who could help to care for his wife and son in his absence. *See id.* at 8.

[53]     As the only medical testimony on the record before us reflects the fact that the lives of Dr. Nine's family members will be placed in jeopardy by his absence to attend trial, we conclude that

the burden of leaving his wife alone to provide 24-hour care for their son is too great and presents too great a risk. *Cf. Bedford v. Am. Honda Motor Co.*, Civil Action No. 1:18-CV-175-GHD-DAS, 2019 WL 7040620, at *3 (N.D. Miss. Dec. 20, 2019) ("This court . . . is not prepared to assume the responsibility for subjecting [the witness] to a life-threatening deposition. Should the court allow the deposition, and the worst occur, no 'amount of apologies or statements of sorrow will compensate for the known risk, especially since the only medical testimony in this case reflects the fact that [the witness's] life will be placed in jeopardy.'" (quoting *In re McCorhill Publ'g, Inc.*, 91 B.R. 223, 225 (S.D.N.Y. 1988))).

[54]    The *Craig* decision itself stands for the proposition that protecting the health of a child is itself an important public policy. *See State v. Rhodes*, 2011 WI 73, ¶ 35, 336 Wis. 2d 64, 799 N.W.2d 850 ("In *Craig*, the important public policy concern was the protection of the 'physical and psychological well-being' of children."). Additionally, Guam has important public policy concerns specifically regarding protecting children who are born in Guam, are disabled, and have been placed with families via foster care and/or adoption. *See, e.g.*, 19 GCA § 13100 *et seq.* (Child Protective Act); *id.* § 13336 (Foster Children's Bill of Rights); *cf. In re Parentage of M.J.*, 787 N.E.2d 144, 151 (Ill. 2003) ("Illinois has a strong interest in protecting and promoting the welfare of its children."); *J.B. v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999) (agreeing that state had important interest in care, disposition, and welfare of disabled children in its custody); *In re C.T.M.*, 1 N.M.I. 171, 172 (1990) ("In our society, both Chamorro and Carolinian cultures, children are held in high esteem. Every effort should be made to ensure that they are protected by due process of law in any possible deprivation of life, liberty, or property. At a minimum, this is required under our concept of fundamental fairness and protection for children."). We thus disagree with Camacho's contention that these "genuine private concerns . . . are not important

public policy concerns." *See* Appellant's Br. at 16. When considered with other factors presented by this case, discussed below, the first prong of *Craig* is met.

### b. Prompt resolution of criminal cases alone is not a public policy that satisfies *Craig*

[55] Any public policy favoring prompt resolution of criminal cases is insufficient to meet *Craig* on its own. *See Rogerson*, 855 N.W.2d at 507 ("There is . . . a general consensus among courts that mere convenience, efficiency, and cost-saving are not sufficiently important public necessities to justify depriving a defendant of face-to-face confrontation."); *Whitaker*, 2024 MT 255, ¶ 22. As the Eleventh Circuit held in *Yates*: "the prosecutor's need for the video conference testimony to make a case and to expeditiously resolve it are not the type of public policies that are important enough to outweigh the Defendants' rights to confront their accusers face-to-face." 438 F.3d at 1316. Although the cost and difficulty of getting Dr. Nine to Guam are not disputed, courts resist this justification. *See, e.g.*, *Faughn v. Commonwealth*, 694 S.W.3d 339, 347 (Ky. 2024) ("While we applaud the Commonwealth for their commitment to the financial well-being of Kentucky's prosecutorial system, a savings of ten to fifteen-thousand dollars cannot outweigh a defendant's constitutional rights."). However, "[w]here considerations beyond mere convenience and expedience are involved, . . . the factual setting of a case may support a finding of necessity to justify the absence of a witness's physical presence at trial." *White*, 116 A.3d at 545-46. For example, the Maryland Court of Special Appeals concluded that "the combined public policy justifications of resolving cold cases and simultaneously protecting the physical well-being of a significant witness are sufficient under *Craig* . . . ." *Id.* at 547.

[56] Beyond noting that Camacho has waived speedy trial, the opening brief does little to engage with this public policy concern addressed by the trial court. *See* Appellant's Br. at 15-16.

Although it was not inappropriate for the trial court to consider this public policy, it is insufficient on its own to meet the *Craig* necessity standard.

### c. Importance of a witness's testimony supports physical confrontation, but public policy favors admission of evidence from the Chief Medical Examiner

[57]     The final public policy concern discussed by the trial court was that "Dr. Nine is the only possible witness regarding the autopsy." RA, tab 63 at 5 (Dec. & Order). The court found, "His testimony is critical to the People's case because he personally performed the autopsy on Victim, and as he testified at the Evidentiary Hearing, no one else was present for the autopsy and it was not videotaped." *Id.* We agree with the Eleventh Circuit's view that—standing alone—the importance of a witness's testimony is not a sufficient public policy concern to satisfy *Craig*. *Yates*, 438 F.3d at 1316 (holding that although "presenting the fact-finder with crucial evidence" is an "important public policy," it did not outweigh defendant's right to face-to-face confrontation); *Sweidan*, 461 P.3d at 388 (rejecting importance to State of witness's testimony as sufficient to support finding of important public policy). The more important a witness's testimony is to the prosecution, the more scrupulously a defendant's confrontation rights must be honored. *See* Reply Br. at 5 ("It appears their main argument is that the more essential the witness is, the fewer constitutional rights of the accused must be recognized.").

[58]     There is a public policy concern regarding Dr. Nine's testimony that is unique to this case and merits discussion. Generally, "we may affirm the judgment below for any reason justified by the record, even if different from the reasons articulated by the trial court." *Ehlert v. Univ. of Guam*, 2019 Guam 27 ¶ 10. A major part of the importance of Dr. Nine's testimony is his former role as the Medical Examiner of Guam. Chapter 81 of Title 10 of the Guam Code Annotated expresses a public policy that the Medical Examiner investigate deaths, perform autopsies, and that his findings be admissible evidence. *See* 10 GCA §§ 81101-81113 (2005). Section 81111

provides: "The records of the Office of Post-Mortem Examinations, or transcripts thereof certified by the Chief Medical Examiner, are admissible in evidence in any court of Guam, except that statements by witnesses or other persons and conclusions upon extraneous matters are not hereby made admissible." Thus, there is a public policy that favors the admissibility of evidence from autopsies performed by the Medical Examiner. *See* 10 GCA §§ 81101-81113. This weighs slightly in favor of meeting *Craig*'s first prong.

[59] We affirm the trial court's decision on the first prong of *Craig* on narrow grounds. When the unique public policy concerns in this case, as argued by the People and found by the trial court, are considered together—the importance of evidence from the Medical Examiner, the health of Dr. Nine's family, and the policy favoring prompt resolution of criminal cases—they meet the *Craig* necessity standard.

### 2. The People have shown that the remote testimony will be "otherwise reliable"

[60] Under the *Craig* test, reliability may be shown and "[p]hysical presence may be excused . . . if the court preserves 'all of the other elements of the confrontation right: . . . . oath, cross-examination, and observation of the witness' demeanor.'" *State v. Trifiletti*, 6 N.W.3d 79, 88 (Minn. 2024) (alterations in original) (quoting *State v. Tate*, 985 N.W.2d 291, 304 (Minn. 2023)). The only reliability challenge raised by Camacho regards a "virtual oath." *See* Reply Br. at 6 ("[A] virtual oath broken outside the jurisdiction of [Guam] is not as enforceable, and therefore less reliable, than an oath broken in the presence of the Judge, Jurors and the Counsel establishing the testimony."). This concern is misplaced. The oath required by the Confrontation Clause is effective only if the witness can be subjected to prosecution for perjury after making a knowingly false statement. *See Harrell v. State*, 709 So. 2d 1364, 1371 (Fla. 1998) ("[A]n oath is only effective if the witness can be subjected to prosecution for perjury upon making a knowingly false statement." (citing *Craig*, 497 U.S. at 845-46)). But the suggestion that a witness testifying

remotely from within the United States would be immune from a perjury prosecution is meritless. *See id.* (holding "the possibility of perjury" would only be "an empty threat for those witnesses that testify via satellite *from outside* the United States" absent a treaty that permits extradition for perjury (emphasis added)). As Ohio, Guam, and federal law all prohibit perjury, a perjury prosecution would not be an empty threat in this case. *See* Ohio Rev. Code Ann. § 2921.11 (West 2025); 18 U.S.C.A. § 1621(1) (Westlaw through Pub. L. 119-59 (2025)); 9 GCA § 52.15 (2005).

[61] Despite quoting post-*Crawford* Supreme Court decisions for the proposition that the Court has "reiterated the rejection of the 'adequate indicia of reliability' exception that had previously existed," Appellant's Br. at 6 (quoting *Smith v. Arizona*, 602 U.S. 779, 783 (2024)), Camacho does not otherwise contend the testimony of Dr. Nine fails to meet the reliability prong of *Craig*, *see* Reply Br. at 5-6. Given our *de novo* review and the interlocutory nature of this appeal, we find it prudent to provide guidance to the trial court regarding the need to preserve the reliability of remote testimony.

[62] As a practical matter, absent technical difficulties, the reliability prong is usually easily met. Jones on Evidence observes that once the first prong of *Craig* is satisfied, "[t]he procedure itself will, as a rule, satisfy the second requirement." 4 Jones on Evidence § 25A:59. However, the remote trial testimony here touches on confrontation considerations beyond the reliability factors discussed in *Craig* (where the witness was still in the courthouse):

> Face-to-face in-court testimony serves several purposes: (1) it "ensures the reliability of the evidence by allowing the trier of fact to observe the demeanor, nervousness, expressions, and other body language of the witness"; (2) it "impresses upon the witness the seriousness of the matter and ensures that statements are given under oath"; and (3) it "helps assure the identity of the witness, that the witness is not being coached or influenced during testimony, and that the witness is not improperly referring to documents."

*See State ex rel. Montgomery v. Kemp*, 371 P.3d 660, 663 (Ariz. Ct. App. 2016) (quoting *United States v. Hamilton*, 107 F.3d 499, 503 (7th Cir. 1997)); *accord In re R.D.*, 2021 IL App (1st)

201411, ¶ 15.  In addition to preserving the oath, cross-examination, and observation of the witness's demeanor, trial courts must take extra steps to ensure the reliability of remote testimony when the witness testifies remotely from outside the courthouse.  Courts must ensure that witnesses called to testify remotely are alone and not subject to being coached.  *In re R.D.*, 2021 IL App (1st) 201411, ¶ 15.  Courts must also make certain that witnesses are not improperly "using notes, documents or electronics while testifying."  *Id.*  These steps "adequately ensure[] that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony."  *Id.* (quoting *Craig*, 497 U.S. at 851).

## V.  CONCLUSION

[63]    *Craig* remains good law and can be applied properly to two-way video testimony of an adult witness.  The People met their burden of showing, and the trial court made adequate case-specific findings, that Dr. Nine's remote testimony is necessary to further an important public policy and is otherwise reliable.  We **AFFIRM**.


| /s/ | /s/ |
|:---:|:---:|
| F. PHILIP CARBULLIDO | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |


/s/
ROBERT J. TORRES
Chief Justice